# United States Court of Appeals
## For the First Circuit

No. 12-1013

C. A. ACQUISITION NEWCO, LLC,

Plaintiff-Appellee,

v.

DHL EXPRESS (USA), INC.,

Defendant-Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Boudin, Hawkins,* and Dyk,**
Circuit Judges.

Anthony C. White, with whom O. Judson Scheaf, III, Philip B. Sineneng, and Thompson Hine LLP were on brief, for defendant-appellant DHL Express (USA), Inc.
Jeffrey E. Poindexter, with whom Andrew Levchuk, Bulkley, Richardson and Gelinas, LLP, Hari S. Nesathurai, and Nesathurai and Luk LLP were on brief, for plaintiff-appellee C.A. Acquisition Newco, LLC.

October 2, 2012

_____

* Of the Ninth Circuit, sitting by designation.
** Of the Federal Circuit, sitting by designation.

**DYK**, **Circuit Judge**.  In this breach-of-contract case, defendant DHL Express (USA), Inc. ("DHL") appeals from a judgment on the pleadings for plaintiff C.A. Acquisition Newco LLC ("Newco").  The district court concluded that DHL had terminated the contract and awarded the $50,000 per month provided for in the contract in the event of a "termination."  See C.A. Acquisition Newco LLC v. DHL Express (USA), Inc., 795 F. Supp. 2d 140, 146 (D. Mass. 2011).  Because we find the contract ambiguous as to whether DHL's actions constituted a termination under the contract, we vacate and remand.

**I.**

DHL is the United States division of DHL International GmBH, an international shipping company.  Until 2008, DHL provided express pick-up and delivery of letters and packages throughout the United States.  In 2006, with the objective of expanding its customer base, DHL decided to install self-service kiosks ("Shipping Spots") at various locations where DHL customers would be able to use touch screens to pay for domestic shipping and print shipping labels.  On August 1, 2006, DHL entered a contract with software developer Cyphermint, Inc. ("Cyphermint"), predecessor in interest to Newco.  Under the contract, which consisted of the Master Services Agreement ("MSA") and the Statement of Work, Cyphermint agreed to provide software for the kiosks.  The initial term of the contract was three years, ending July 31, 2009.

Under the contract's Statement of Work, Cyphermint was obligated to supply a software package, including advertising software, which could then be installed on an indefinite number of kiosks provided by DHL. It appears that the software development was to be completed before DHL began installation of the kiosks. Cyphermint was to receive $0.35 per transaction and would share advertising revenues with DHL flowing from advertisements displayed at the kiosks. Once Cyphermint developed that software, its performance was essentially complete; it merely had to monitor the use of that software at the shipping spots. Any subsequent "[e]nhancements, improvements, [or] modifications" to the software would be provided separately by Cyphermint at an $80 per hour rate. J.A. 95. The MSA also provided, in section 2.8, that "[n]othing in this Agreement guarantees the number or placement of DHL Shipping Spot(s)" and that the number of Shipping Spots "is solely within the discretion of DHL." J.A. 60. The contract does not explicitly require DHL to deal exclusively with Cyphermint, and it appears to contemplate that DHL will only pay the $0.35 per transaction fee at "DHL Shipping Spot fixtures containing Cyphermint software." J.A. 94.

According to Newco's amended complaint, but disputed in DHL's answer, 7,755 Shipping Spots were initially projected, and by October 14, 2008, 5,415 Shipping Spots had been deployed. Id. at 30-31, 42. In August 2008, following Cyphermint's bankruptcy,

-3-

Newco assumed Cyphermint's obligations, rights, and liabilities under the contract. In late 2008 (before the contract's expiration), because of the weak economy, DHL decided to discontinue all domestic shipping within the United States, including the Shipping Spot project.

The crux of this dispute is whether DHL "terminated" the contract when it totally eliminated all Shipping Spots. The MSA incorporated various provisions concerning early termination of the contract. Section 10.2 stated that termination for cause could occur after a material breach. The contract is reasonably clear that no termination compensation would be payable in the event of a DHL termination flowing from a material breach by Cyphermint, but that termination compensation would be payable if Cyphermint terminated the contract as the result of a material breach by DHL. There is no contention that either party materially breached the agreement (except insofar as Cyphermint contends that DHL improperly failed to pay termination compensation), or that DHL terminated the agreement for cause.

Cyphermint points out that the agreement provided for termination fees in the event that the agreement was terminated by DHL without material breach by Cyphermint. The Statement of Work provided that "[s]hould DHL terminate this agreement for any reason other than a material breach by Cyphermint before its termination date DHL agrees to compensate [Cyphermint] in the amount of $50,000

per month for each month remaining in the initial term." J.A. 95. Section 10.5 also stated that "[t]here shall be no termination fees for any termination by either party, irrespective of the reason for such termination, except for a 'Material Breach' or as provided pursuant to the 'Statement of Work' [set forth above]." J.A. 69. Finally, section 10.3 stated that "[i]n addition to the other termination rights set forth in this Section 10, [Cyphermint] may terminate [its] Services in the event that DHL elects to cease supporting the DHL Shipping Spot Project." J.A. 69.

There is no dispute that the termination fees are payable here if DHL did "terminate" the agreement. The question is whether DHL's actions amounted to a termination. On November 12, 2008, after learning of DHL's decision, Newco's counsel requested confirmation "that DHL intends to terminate the agreement" on November 21. C.A. Acquisition Newco, 795 F. Supp. 2d at 143. DHL responded on November 16 simply that "shipping will cease on November 21." Id.

On December 8, Newco requested early termination fees of $413,333.33 ($50,000 per month until July 31, 2009). After DHL refused to pay, Newco sued for breach of contract and other claims. The case was removed from the Superior Court of the Commonwealth of Massachusetts to federal court. The federal district court granted Newco's motion for judgment on the pleadings on its breach-of-contract claim, concluding that DHL "fail[ed] to explain how

-5-

reducing the [number of] shipping spots to zero is in <u>any</u> way different from terminating the Contract." <u>Id.</u> at 146. The parties stipulated to dismissal of Newco's other claims and to the amount of damages, and the district court entered final judgment for Newco of $413,333.33 plus interest. DHL timely appealed from this judgment, and we have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 1294(1).

## II.

We review the grant of a judgment on the pleadings under Fed. R. Civ. P. 12(c) de novo, "view[ing] the facts contained in the pleadings in the light most favorable to the nonmovant and draw[ing] all reasonable inferences therefrom." <u>Perez-Acevedo</u> v. <u>Rivero-Cubano</u>, 520 F.3d 26, 29 (1st Cir. 2008) (quoting <u>R.G. Fin. Corp.</u> v. <u>Vergara-Nunez</u>, 446 F.3d 178, 182 (1st Cir. 2006)) (internal quotation marks omitted). "Contract interpretation, when based on contractual language without resort to extrinsic evidence, is a 'question of law' that is reviewed de novo." <u>OfficeMax, Inc.</u> v. <u>Levesque</u>, 658 F.3d 94, 97 (1st Cir. 2011) (citing <u>Principal Mut. Life Ins. Co.</u> v. <u>Racal-Datacom, Inc.</u>, 233 F.3d 1, 3 (1st Cir. 2000)). The contract states that it "shall be governed by and construed in accordance with the laws of the State of Florida," DHL's principal place of business. J.A. 197. "Under Florida law, courts must give effect to the plain language of contracts when that language is clear and unambiguous. Whether a contract

provision is ambiguous is a question for the court." <u>Arriaga</u> v. <u>Florida Pac. Farms, L.L.C.</u>, 305 F.3d 1228, 1246 (11th Cir. 2002) (citation omitted).

On appeal each side argues that its construction of the contract is mandated by the contract's plain language -- Cyphermint that DHL's actions clearly amounted to a termination, and DHL that its actions were clearly not a termination. We conclude that both sides are mistaken.

DHL invokes two contractual provisions to support its argument that ending the Shipping Spot Project is not a termination of the contract. First, it argues that MSA section 2.8, which states that the "number . . . of DHL Shipping Spot(s)" is not guaranteed and "is solely within the discretion of DHL," J.A. 60, gives it the right to reduce the number of shipping spots to zero, and that such action cannot be a termination. Second, DHL argues that MSA section 10.3, which states that "[i]n addition to [its] other termination rights . . . [Cyphermint] may terminate [its] Services in the event that DHL elects to cease supporting the DHL Shipping Spot Project," would make no sense if the contract were automatically terminated by DHL's cessation of the Shipping Spot Project.

The district court concluded, and Newco argues on appeal, that these two provisions did not create ambiguity. While MSA section 2.8 grants DHL discretion over the number of Shipping

-7-

Spots, the district court concluded that "it does not . . . permit [DHL] to stop performing altogether for any reason or no reason." C.A. Acquisition Newco, 795 F. Supp. 2d at 144. The court also concluded that MSA section 10.3 "merely identifies one possible remedy available to [Cyphermint] upon notification that [DHL] intends to terminate the agreement," and that the reference to "other termination rights" triggered by DHL's cessation of the project supports Newco's view. Id. at 145.

We agree that the contract might reasonably be interpreted as the district court and Newco suggest, as requiring DHL to pay the $50,000 per month termination fee if it ceases all shipping so that Cyphermint (now Newco) is not receiving any $0.35 per transaction payments. As the district court noted, the cessation of shipping (which ends the Shipping Spot Project) seems to fall within the ordinary meaning of "terminate." See Mac's Shell Serv., Inc. v. Shell Oil Prods. Co., 130 S. Ct. 1251, 1257 (2010) ("The word 'terminate' ordinarily means 'put an end to.'" (quoting Webster's New International Dictionary 2605 (2d ed. 1957))). However, we think DHL's interpretation might also be reasonable based on the language of the contract: termination of the Shipping Spot Project is not necessarily equivalent to termination of the agreement, particularly in light of MSA section 2.8, giving DHL "sole[] . . . discretion" over the number of Shipping Spots. The parties might have intended the termination

-8-

fees to apply if DHL elected to continue the project with a different software supplier but not if economic conditions led to a cancellation of the Shipping Spot project entirely. We thus conclude that the contract is ambiguous as to whether DHL's actions constituted a termination.

"When a contract is ambiguous, Florida law provides rules of construction to infer the meaning." Arriaga, 305 F.3d at 1246-47. For example, "courts may receive evidence extrinsic to the contract for the purpose of determining the intent of the parties at the time of the contract" and may also consider factors such as the "circumstances surrounding the parties at the time the contract was made," "custom and usage" of ambiguous terms, and "certain public policy concerns." Id. at 1247 (citations and internal quotation marks omitted). It is also well established that a contract should be interpreted to be reasonable. See Excelsior Ins. Co. v. Pomona Park Bar & Package Store, 369 So. 2d 938, 941 (Fla. 1979) ("A reasonable interpretation of a contract is preferred to an unreasonable one.") (citing James v. Gulf Life Ins. Co., 66 So. 2d 62 (Fla. 1953)). In the commercial context, courts should avoid interpreting contracts to be "commercially unreasonable." See John Hancock Life Ins. Co. v. Abbott Labs., 478 F.3d 1, 8 (1st Cir. 2006); see also XCO Int'l Inc. v. Pac. Scientific Co., 369 F.3d 998, 1005 (7th Cir. 2004) ("Contract interpretations that produce commercially unreasonable results are

disfavored . . . because they are implausible to impute to the parties.").

The pleadings do not establish the facts necessary to resolve the ambiguity. It follows that judgment on the pleadings (which requires that there be no relevant factual dispute) was inappropriate. At this stage of the proceedings it is not possible to anticipate precisely what extrinsic evidence might resolve the ambiguity, but there are several possibilities.

For example, evidence related to the purpose of the early termination fee provision is likely relevant in determining whether DHL's actions constitute a termination. In the amended complaint, Newco alleged that the parties were originally considering a fee structure under which Cyphermint would have received over $6,000,000 in development and licensing fees, and that the early termination fee was inserted after the parties switched to the transaction-based payment structure, with the understanding that it would allow Cyphermint to recover its initial investment if DHL terminated the contract early. DHL disputes this version of the negotiating history. Evidence as to the negotiating history of the contract may well be helpful in resolving the ambiguity. Needless to say, although each party's uncommunicated subjective understanding of the agreement during negotiations is generally irrelevant, statements of subjective intent are relevant when contrary to the party's own interests. See Gendzier v. Bielecki,

97 So. 2d 604, 609 (Fla. 1957) ("[E]vidence of the unilateral secret intent of a party to a written instrument is in and of itself immaterial to the actual creation of a contract.") (citations omitted); 5 Corbin on Contracts § 24.10 (Matthew Bender & Co. 2012) ("A party will not be permitted to build up an argument by means of self-serving statements. Such statements should be admissible against that party, however, as admissions against that party's interest."). The district court should also consider any relevant industry practices.

Extrinsic evidence would also be useful in determining whether the parties' differing interpretations are commercially reasonable. On this issue it will be necessary to determine what consideration supported DHL's initial promise if DHL in fact had unbridled discretion to have zero Shipping Spots. DHL's theory –– that it had no obligation to install any kiosks –– might render the contract commercially unreasonable absent some meaningful promise in return.[1]

Under Newco's interpretation, the only consideration provided by DHL (in the case of a DHL decision to never create any Shipping Spots) is the termination fee, which would be triggered if

---

[1] While the parties appear to agree that the contract is not illusory, they have not clearly identified the consideration given by DHL to Cyphermint that renders the contract not illusory at the time of execution. "It is a fundamental principle that a contract is to be construed as meaningful and not illusory." Cofman v. Acton Corp., 958 F.2d 494, 497 (1st Cir. 1992).

DHL elected to have zero Shipping Spots from the beginning of the contract.  But there are also other constructions that might be given to the contract to render it commercially reasonable at the time of contracting.  For example, while DHL does not appear to explicitly agree in the contract not to use software provided by others (and the $0.35 per transaction payments apparently only apply to kiosks using Cyphermint software), if the contract were construed to require DHL to deal exclusively with Cyphermint and to use best efforts to advance the project, that promise could serve as consideration.  See U.C.C. § 2-306(2) ("A lawful agreement . . . for exclusive dealing . . . imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale."); Fla. Stat. § 672.306(2) (adopting U.C.C. rule); 2 Corbin on Contracts § 6.5.  But the question exists whether such promises would be sufficient to render it commercially reasonable.

We do not intend the above to be an exhaustive list of the evidence or factors that might be pertinent in resolving the ambiguity in the contract language; rather, we simply note them to confirm that the language of the contract itself -- while pertinent to resolving the ambiguity -- is not the only source of relevant evidence.

**Vacated and Remanded.  Costs to appellant.**