# United States Court of Appeals
## For the First Circuit

---

Nos. 13-1120, 13-1121

MICHAEL THOMPSON,

Plaintiff, Appellant; Cross-Appellee,

v.

NANCY CLOUD; MICHAEL MILES,

Defendants, Appellees; Cross-Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

---

Before

Selya, Stahl and Lipez,
Circuit Judges.

---

Damon M. Seligson, with whom Dinicola, Seligson & Upton, LLP was on brief, for appellant, cross-appellee.
Christopher R. Largay, with whom Largay Law Offices, P.A. was on brief, for appellees, cross-appellants.

---

August 20, 2014

---

**LIPEZ, Circuit Judge**. After Michael Thompson purchased a multimillion-dollar oceanfront property in Bar Harbor, Maine from Nancy Cloud and Michael Miles, he discovered a number of problems with the property that required significant expenditures to repair. He brought this suit to recover damages for those repairs, alleging, inter alia, breach of contract, fraud, and negligent misrepresentation.[1] The district court entered summary judgment for the defendants, holding that Maine's implied warranty of habitability did not apply under the circumstances of this case, and that defendants had no duty of disclosure. The district court also entered judgment on the record for the plaintiff on the defendants' counterclaim for attorney's fees.

Plaintiff now appeals and defendants cross-appeal. We affirm the district court's decisions on all counts, albeit employing slightly different reasoning.

**I.**

In October 2008, appellant Thompson purchased a home in Bar Harbor (called "Seascape") from appellees Miles and Cloud for $2.9 million. Miles and Cloud originally purchased the land for a home in 2000 and subsequently had Seascape constructed there. The pair lived at Seascape during the summer seasons between 2002 and 2004, and then listed the property for sale. While the

---

[1] Thompson's wife, Kathleen, originally joined in this action but was subsequently dismissed because she was not a party to the real estate transaction at issue.

-2-

property was listed, Miles and Cloud rented it out on a seasonal basis, but otherwise (in their own words) "had very little to do with Seascape."

Seascape was constructed from plans for an existing home in South Carolina that had been prepared by Architect Stephen Fuller. Having seen that Fuller-designed home, Miles purchased the plans for use in the construction of Seascape. The plans did require some modification. Although Miles listed himself on the Seascape building permit application as "owner and general contractor," his employee Michael Gallant, along with a number of other subcontractors hired by Miles, actually constructed the home. While Seascape was under construction, Miles and Cloud spent part of the year in Florida and part at their other properties in Maine. When in Maine, Miles would stop by to see the progress of Seascape's construction.

After living in the house for the 2004 summer season, Miles and Cloud listed Seascape for sale at $3.5 million. In September 2007, Miles and Cloud signed a Seller's Property Disclosure stating that there were no known "material defects." Around that time, Thompson became interested in the property.

Through their respective real estate brokers, Thompson and Miles exchanged a number of emails pertaining to potential problems with the residence, including possible water damage. As a result of those conversations, Miles and Cloud signed another

Seller's Property Disclosure, acknowledging that there had previously been issues with leaking around the fireplace, the copper canopy, and the stone work that (to their knowledge) had been resolved. This second disclosure, like the first, stated that it was not to be interpreted as a warranty on the property and would not be incorporated as part of the contract between buyer and seller.

Ultimately, in August 2008, Thompson entered into an agreement with Miles and Cloud to purchase the property for the reduced price of $3.1 million. Before the closing, however, Thompson engaged Bill Barter to conduct an inspection of the home, which identified more potential issues.[2] Performing a standard visual inspection only, Barter could not determine the full extent of any potential damage. Thompson then had the home examined by a contractor who recommended that all of the windows be replaced. As a result of these inspections, Thompson sought a further reduction in the purchase price. Miles and Cloud agreed to lower the price in exchange for the incorporation of an "as-is" provision in the Purchase and Sale Agreement. The Purchase and Sale Agreement was thus modified to include an Investigation Contingency Amendment

---

[2] Barter's report specifically mentioned leaking at the copper entrance canopy and asphalt roof caused by ice dams; damage to the downspouts for the gutter system; workmanship and materials in the home's exterior construction of only modest quality; doors and windows of only modest quality; windows that needed to be upgraded to improve energy efficiency; and moisture penetration and damage to fireplaces.

that reduced the sale price by $190,000 and specified that the property was being sold "as is."  The provision of the Purchase and Sale Agreement stated, in pertinent part:

> Buyer is encouraged to seek information from professionals regarding any specific issue or concern. Neither [s]eller nor Licensee makes any warranties regarding the condition, permitted use or value of Seller['s] real or personal property. This Agreement is subject to the following investigations, with results being satisfactory to Buyer: [(a) General Building, (b) Chimney, (d) Sewage Disposal, (e) Water Quality, (f) Water Quantity, (g) Air Quality), (i) Mold, (r) Insurance.[3]]  All investigations will be done by persons chosen and paid for by Buyer in Buyer's sole discretion. . . .  In the absence of investigation(s) mentioned above, Buyer is relying completely upon Buyer's own opinion as to the condition of the property.

On October 14, 2008, the parties closed on the property.

Since his purchase of Seascape, Thompson has spent in excess of $1.5 million in repairs to the property, which included repairing damage to the foundation and water damage in other areas of the house.  In January 2010, Thompson sent Miles and Cloud a demand letter pursuant to Massachusetts General Laws chapter 93A[4]

---

[3] The various areas to be inspected were chosen from a list that was part of what was apparently a form purchase and sale agreement.  The types of inspections were listed from (a) to (s) and marked with an "x" where appropriate.

[4] Thompson ultimately brought his unfair trade practices claim under Maine law.  Me. Rev. Stat. tit. 5, § 205-A et seq.  During argument on Miles and Cloud's summary judgment motion, see infra, Thompson conceded that this claim could not go forward because Miles and Cloud were not engaged in trade or commerce. Accordingly, we need not discuss it further on appeal.

seeking to recover the money he lost on repairs, which he claimed resulted from the sellers' unfair and deceptive practices. After the sellers refused to meet his demands, Thompson brought suit in the United States District Court for the District of Massachusetts[5] seeking money damages against Miles and Cloud on theories of breach of the implied covenant of good faith and fair dealing, promissory estoppel, unfair trade practices, breach of contract, fraud, and negligent misrepresentation.

Miles and Cloud moved to dismiss the complaint. The district court granted that motion with respect to the claims of breach of the implied covenant of good faith and fair dealing and promissory estoppel. Along with their subsequent answer to the complaint, Miles and Cloud filed a counterclaim seeking legal fees on the theory that Thompson violated a mediation provision contained in the Purchase and Sale Agreement.[6] Adopting the

_____

[5] Venue was eventually transferred to the United States District Court for the District of Maine.

[6] The purchase and sale agreement included a mediation provision that stipulated as follows:

> Earnest money disputes subject to the jurisdiction of small claims court will be handled in that forum. For all other disputes or claims arising out of or relating to this Agreement or the property addressed in this Agreement [sic] shall be submitted to mediation in accordance with the Maine Residential Real Estate Mediation Rules. Buyer and Seller are bound to mediate in good faith and pay their respective mediation fees. If a party does not agree first to go to mediation, then that party will be liable for the other party's legal fees in any subsequent litigation regarding that same matter in which the party who refused to go to mediation

recommendation of the magistrate judge, the district court granted summary judgment for Miles and Cloud on all remaining claims of the complaint in March 2012. Shortly thereafter, the parties filed a joint motion for judgment on the stipulated record as to Miles and Cloud's counterclaim. In January 2013, the district court entered judgment in favor of Thompson on the counterclaim. Both parties now appeal.

**II.**

**A. Thompson's Claims**

Thompson argues that the district court erred in granting summary judgment because genuine issues of material fact remain concerning his claims for breach of contract, fraud, and negligent misrepresentation.

We review the district court's summary judgment decisions de novo. Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 428 (1st Cir. 2000). Summary judgment is properly granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering the summary judgment record, "[a]ll reasonable inferences are to be drawn in favor of the party opposing summary judgment, in this case appellant [Thompson], just as all disputed facts are viewed in the light most favorable to him." O'Connor v. Steeves, 994 F.2d 905, 907 (1st

loses in that subsequent litigation.

-7-

Cir. 1993). In assessing Thompson's claim that genuine material issues exist, we must decide whether "the evidence is such that a reasonable jury could return a verdict for [Thompson]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Federal jurisdiction in this case is based on diversity of citizenship. See 28 U.S.C. § 1332. We apply the law of the state of Maine to the contract and tort claims at issue because Maine is the site of the real property at the heart of the dispute and the transactions relating to it. The parties do not contend otherwise.

## 1. Breach of Contract

Thompson's breach of contract claim is not based on an explicit provision of the Purchase and Sale Agreement. Instead, he relies on Maine's implied warranty of habitability.[7] "In Maine the law implies a warranty of habitability on the part of the builder-vendor in the sale of a new home." Stevens v. Bouchard, 532 A.2d 1028, 1030 (Me. 1987).

On appeal, Thompson stresses that there exists a genuine issue of fact as to whether Miles was the builder of Seascape.

---

[7] This is an implied warranty that a home will be suitable for human habitation. The Maine Supreme Judicial Court, sitting as the Law Court (hereinafter, the "Law Court"), has further explained that "[w]hether or not a particular defect renders the dwelling 'unsuitable' necessarily requires inquiry as to whether a reasonable person faced with such a defect would be warranted in concluding that a major impediment to habitation existed." Banville v. Huckins, 407 A.2d 294, 297 (Me. 1979).

Miles and Cloud contend otherwise, pointing to evidence that their employee, Gallant, actually handled all of the construction. Regardless of who performed the manual labor, there is no dispute that Miles listed himself as the "general contractor" on the building permit for Seascape. Hence, there remains a genuine issue of fact as to whether or not Miles was the builder. However, Maine applies the implied the warranty of habitability against "builder-vendors," not mere builders.

The Law Court has described a "builder-vendor" as "'the contractor who builds on his own land for the purpose of sale.'" Banville v. Huckins, 407 A.2d 294, 296 (Me. 1979)(emphasis added)(quoting Wimmer v. Down E. Props., Inc., 406 A.2d 88, 92 (Me. 1979)); accord Park v. Sohn, 433 N.E.2d 651, 655 (Ill. 1982)(defining "the builder-vendor as one who is engaged in the business of building, so that the sale is of a commercial nature, rather than a casual or personal one"); Elderkin v. Gaster, 288 A.2d 771, 774 n.10 (Pa. 1972)(defining a "builder-vendor" as "one who buys land and builds homes upon that land for purposes of sale to the general public"); Mazurek v. Nielsen, 599 P.2d 269, 270-71 (Colo. App. 1979)(defining a builder-vendor as one whose "primary reason for constructing the house is to resell it").[8] Here, it is

---

[8] See also Dillig v. Fisher, 688 P.2d 693, 695 (Ariz. Ct. App. 1984)("The courts considering this question in other jurisdictions have consistently held that the seller's intent or purpose in constructing and selling a house is the critical issue in determining whether the sale is subject to the implied warranty of

undisputed that Miles and Cloud built Seascape not to sell it, but to reside in it, which they subsequently did for a number of years. As a federal court exercising diversity jurisdiction, we should not expand Maine's definition of "builder-vendor" to a person so situated for the purposes of implying a warranty of habitability against him. Rared Manchester NH, LLC v. Rite Aid of N.H., Inc., 693 F.3d 48, 54 (1st Cir. 2012) ("Concerns both of prudence and of comity argue convincingly that a federal court sitting in diversity must hesitate to chart a new and different course in state law.").

Moreover, even if Miles could be considered a "builder-vendor" under Maine law, the warranty of habitability would not be implied in the sale of property at issue because Seascape is indisputably not a "new home."  Maine has thus far implied the warranty of habitability only in cases involving the sale of "new homes."  See Stevens, 532 A.2d at 1030 (refusing to expand the implied warranty of habitability to the sale of an existing home and explaining that past expansions of the warranty have all involved "the sale of a new home"); see also Wimmer, 406 A.2d at 92 (reiterating that "in the sale of a new house by a builder-vendor, the law implies [a] warrant[y] that the house is suitable for habitation" (emphasis added)).  Here, it is undisputed that Seascape was constructed some six years prior to Miles and Cloud

---

habitability."(collecting cases)).

selling it to Thompson.  During those prior six years, Miles and

Cloud both lived in the property and rented it out on a seasonal

basis.  No reasonable jury could conclude that it was a "new home."

Accordingly, the sale of Seascape was not accompanied by an implied

warranty of habitability, contrary to Thompson's breach of contract

claim.  The district court properly granted summary judgment for

Miles and Cloud on that claim.

### 2.  Fraud and Negligent Misrepresentation

Thompson's fraud and negligent misrepresentation claims

are based on allegations that Miles knew of the problems with

Seascape, yet failed to disclose them, either intentionally in

order to deceive Thompson or negligently.  Under Maine law both

fraud[9] and negligent misrepresentation[10] require "justifiable

---

[9] Under Maine law fraud has the following five elements: (1) A party made a false representation, (2) The representation was of a material fact, (3) The representation was made with knowledge of its falsity or in reckless disregard of whether it was true or false, (4) The representation was made for the purpose of inducing another party to act in reliance upon it, and (5) The other party justifiably relied upon the representation as true and acted upon it to the party's damage.
Barr v. Dyke, 49 A.3d 1280, 1286-87 (Me. 2012) (emphasis omitted).

[10] Maine courts, borrowing from the Restatement (Second) of Torts, have defined negligent misrepresentation as follows:
One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in

-11-

reliance" on a misrepresentation.  The parties dwell on the question of whether Miles and Cloud had a duty to disclose all known defects to Thompson.[11]  However, we need only look to this common element of "justifiable reliance" to decide whether summary judgment was appropriately granted to Miles and Cloud on the fraud and negligent misrepresentation claims.

It is undisputed that an "as-is" provision was incorporated into the Purchase and Sale Agreement in exchange for the $190,000 final reduction in sale price.  Specifically, the Purchase and Sale Agreement included the following disclaimer of reliance:  "All investigations will be done by persons chosen and paid for by Buyer in Buyer's sole discretion. . . . In the absence of investigation(s) mentioned above, Buyer is relying completely upon Buyer's own opinion as to the condition of the property."

The Law Court has articulated the following factors in determining whether a "disclaimer-of-reliance clause" (i.e., an "as-is" provision) can defeat a claim of fraud at summary judgment:

> (1) Whether the complaining party was advised
> by counsel;

---

obtaining or communicating the information.
Chapman v. Rideout, 568 A.2d 829, 830 (Me. 1990) (emphasis omitted) (quoting and adopting Restatement (Second) of Torts § 552(1) (1977)).

[11] Indeed, the district court focused on this issue, finding the lack of a duty of disclosure dispositive as to all of Thompson's claims.  We focus on a different issue.

(2) Whether the terms of the agreement were negotiated and not boilerplate;

(3) Whether the transaction was an arm's-length transaction;

(4) Whether the parties were knowledgeable in business matters;

(5) Whether the language of the clause was clear; and

(6) Whether, if litigation was against a fiduciary, the adversarial relationship of the parties demonstrated an absence of trust between the parties that negated any claim of reasonable reliance.

Barr v. Dyke, 49 A.3d 1280, 1289 (Me. 2012) (footnotes omitted). The Court explained that "no one factor will be dispositive," id., and held that "[w]hen the language of a contract is unambiguous and disclaims reliance regarding the subject of a later allegation of fraud, the party seeking to survive a summary judgment motion and avoid the contractual disclaimer of reliance bears the burden of producing evidence that demonstrates a genuine issue of material fact regarding these factors." Id. at 1290.[12]

Here, Thompson has failed to meet that burden. Obviously, the defendants are not fiduciaries. It is undisputed that both parties were represented by counsel in the real estate transaction, and the final terms of the Purchase and Sale Agreement

---

[12] Although the Law Court's legal proposition addresses the relationship between a "disclaimer-of-reliance clause" and the element of justifiable reliance in a fraud claim, its logic applies as well to that relationship in a negligent misrepresentation claim.

-13-

were a product of extended negotiations.  Thompson produced no evidence to suggest that he was unskilled in business matters, or even simply overmatched by Miles's prowess.  There is also nothing in the record to suggest that the sale of Seascape was anything but an ordinary, arms-length real estate transaction.  Perhaps most importantly, the language of the "as-is" provision is abundantly clear -- Thompson was to rely only on those inspections that he arranged for, and otherwise on his own opinion in determining the condition of the property.  Thompson also retained the right to cancel the Purchase and Sale and Agreement if any of those inspections were unsatisfactory, but he declined to exercise that option.  Thus, with all of the relevant factors working against him, Thompson should be held to that disclaimer of reliance.  The district court properly granted summary judgment for Miles and Cloud on the fraud and negligent misrepresentation claims.

**B.  Miles and Cloud's Counterclaim**

In their cross-appeal Miles and Cloud assert that the district court improperly entered judgment on the record against them on their claim for attorney's fees, which was based on the Purchase and Sale Agreement's mediation provision.  That judgment was entered pursuant to a joint motion requesting a decision on a stipulated record. As we explained in <u>Boston Five Cents Savings Bank</u> v. <u>Department of Housing & Urban Development</u>, when facing such a motion the district court may "decide any significant issues of

material fact that [it] discovers" in the stipulated record. 768 F.2d 5, 11-12 (1st Cir. 1985). We review such factual findings under a clear error standard, García-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 643-44 (1st Cir. 2000), and we review the district court's legal conclusions de novo. C.A. Acquisition Newco, LLC v. DHL Express (USA), Inc., 696 F.3d 109, 112 (1st Cir. 2012) ("Contract interpretation, when based on contractual language without resort to extrinsic evidence, is a 'question of law' that is reviewed de novo." (quoting OfficeMax, Inc. v. Levesque, 658 F.3d 94, 97 (1st Cir. 2011) (internal quotation marks omitted))).

Thompson commenced this litigation after sending to Miles and Cloud a demand letter, as required by Massachusetts's unfair and deceptive trade practices law, and then receiving a response from their attorney refusing to pay for the repairs noted therein. It is undisputed that neither party invoked the mediation clause at that point. Instead, Miles and Cloud answered the complaint and filed a counterclaim. The venue of the dispute did change from Massachusetts to Maine, but the forum (United States District Court) did not.

The mediation provision of the Purchase and Sale Agreement first stipulated that all major disputes concerning Seascape or the sales transaction must be mediated:

> Earnest money disputes subject to the jurisdiction of small claims court will be handled in that forum. For all other disputes or claims arising out of or relating to this

> Agreement or the property addressed in this Agreement [sic] shall be submitted to mediation in accordance with the Maine Residential Real Estate Mediation Rules. Buyer and Seller are bound to mediate in good faith and pay their respective mediation fees.

There is no dispute as to the validity of that mediation requirement or whether Thompson's claims were subject to it.[13] Miles and Cloud's counterclaim for attorney's fees concerns the next clause of the mediation provision, which states that "[i]f a party does not agree first to go to mediation, then that party will be liable for the other party's legal fees in any subsequent litigation regarding that same matter in which the party who refused to go to mediation loses in that subsequent litigation." (Emphases added). At issue here is whether this language requires that a party explicitly refuse to mediate before the obligation to pay the other party's legal fees arises, or whether, as Miles and Cloud argue, the filing of a lawsuit alone could constitute the required refusal to mediate.

Although the mediation provision could have been drafted to equate the filing of a lawsuit with a refusal to mediate, that provision takes a different approach by imposing the penalty of paying attorney's fees only when a party "does not agree first to go to mediation." This language conditions the contractual remedy

---

[13] There is some dispute about whether Miles and Cloud waived their right to invoke the provision when they actively engaged in the litigation without mentioning it; however, we need not reach that issue.

for the failure to mediate -- the payment of the attorney's fees of the winning party in litigation -- on the effort of that party to first secure a reaffirmation of the agreement to mediate from the opposing party when a dispute covered by the mediation provision arises.  If that effort at reaffirmation leads to a refusal to mediate, and the parties must resort to litigation to resolve the dispute, the contractual remedy becomes available. By requiring this additional interaction of the parties over the obligation to mediate, the agreement requires, in effect, that the refusal to mediate be clear before the heavy sanction of attorney's fees can be imposed.  It also ensures that any departure from the "'American Rule' that each party pays its own fees," Doe v. Boston Public Schools, 358 F.3d 20, 25 (1st Cir. 2004), is the result of a clear contractual breach.

Although somewhat awkward, there is a point to such an approach.  A party in Thompson's position may file a lawsuit for a reason that does not indicate a refusal to mediate (e.g., preservation of claims that could be time-barred), or may resort to litigation first without an actual objection to mediation once reminded of the contractual provision.  It might be harsh to impose the strong penalty of attorney's fees against a party so acting without a clear indication of that party's intentions regarding mediation.

There is support for the requirement of a clear refusal to mediate in a related area of the law -- arbitration. Arbitration and mediation have long been cited together when describing extra-judicial dispute resolution mechanisms. See, e.g., Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 752 (1945) (Frankfurter, J., dissenting) (describing the "specialized machinery of mediation and arbitration" as a method of escape from "illadapted judicial interferences"). Indeed, mediation is often explicitly required as a necessary precursor to arbitration in contract provisions. See, e.g., Next Step Med. Co. v. Johnson & Johnson Int'l, 619 F.3d 67, 69 (1st Cir. 2010) (analyzing a provision that stated "[a]ny dispute that has not been resolved in mediation, shall then be settled by arbitration"). Thus, we think it appropriate to consult precedent interpreting arbitration requirements to analyze the mediation provision at issue here.

In diversity cases calling for the interpretation of an arbitration agreement, we generally apply the Federal Arbitration Act. See, e.g., New Eng. Energy Inc. v. Keystone Shipping Co., 855 F.2d 1, 4 n.2 (1st Cir. 1988). Section 4 of the Act provides a judicial remedy when one party refuses to honor an arbitration agreement. That section gives federal courts the power to compel arbitration when one party has been "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration." 9 U.S.C. § 4 (1988)(emphasis

-18-

added).  District courts in our circuit interpreting this language have looked for evidence in the record "demonstrat[ing] that the plaintiff will refuse to arbitrate," even where the plaintiff, already a party to a contract requiring arbitration, had initiated federal litigation without first attempting to arbitrate.  Vimar Seguros Y Reaseguros, S.A. v. M/V Sky Reefer, No. CIV. A. 91-13345 WF, 1993 WL 137483, at *5 (D. Mass. Apr. 19, 1993); see also Unión Independiente de Abogados de la Sociedad para Asistencia Legal v. Sociedad para Asistencia Legal de P.R., Inc., 706 F. Supp. 3, 5 (D.P.R. 1989).  The Third Circuit has stated the rule even more precisely, holding that a party must "unequivocally refuse[] to arbitrate, either by failing to comply with an arbitration demand or by otherwise unambiguously manifesting an intention not to arbitrate the subject matter of the dispute."  PaineWebber Inc. v. Faragalli, 61 F.3d 1063, 1066 (3d Cir. 1995).  We think this standard requiring a clear refusal to arbitrate further supports the approach taken in the mediation provision at issue here.

There is no evidence in the record showing an unequivocal refusal to mediate on Thompson's part.  It is undisputed that Miles and Cloud did not request mediation prior to the commencement of litigation or after the complaint was filed.  They also made no motion to compel mediation in response to the complaint.  Instead, they actively litigated the dispute in federal court.  The clear

-19-

refusal required to trigger the attorney's fee obligation simply did not exist here.

## III.

For the foregoing reasons, we <u>affirm</u> the award of summary judgment for the defendants on the plaintiff's breach of contract, fraud, and negligent misrepresentation claims.  We <u>affirm</u> the entry of judgment for the plaintiff on the defendants' counterclaim.  All parties shall bear their own costs.

**<u>So ordered.</u>**