# United States Court of Appeals
# for the Federal Circuit

---

**RELIABLE CONTRACTING GROUP, LLC,**
*Appellant*

**v.**

**DEPARTMENT OF VETERANS AFFAIRS,**
*Appellee*

---

2014-1326

---

Appeal from the Civilian Board of Contract Appeals in No. 3048, Administrative Judge Anthony S. Borwick, Administrative Judge Patricia J. Sheridan, Administrative Judge Stephen M. Daniels.

---

Decided: March 6, 2015

---

REGINALD ASHTON WILLIAMSON, Kilpatrick Townsend & Stockton LLP, Atlanta, GA, argued for appellant. Also represented by WILLIAM E. DORRIS; THURSTON HOLDERNESS WEBB, Winston-Salem, NC.

WILLIAM JAMES GRIMALDI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellee. Also

represented by STUART F. DELERY, ROBERT E. KIRSCHMAN, JR., KIRK T. MANHARDT.

———————————

Before NEWMAN, CLEVENGER, and DYK, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* DYK.  Dissenting opinion filed by *Circuit Judge* NEWMAN.

DYK, *Circuit Judge.*

Reliable Contracting Group, LLC ("Reliable") appeals from a decision by the Civilian Board of Contract Appeals ("Board").  The Board denied Reliable's claim for an equitable adjustment of a Department of Veterans Affairs ("VA") contract which required the installation of three backup generators for a VA medical center.  Reliable contends that the VA improperly rejected the generators on the ground that they were not "new" as required by the contract.  Because we hold that the Board erred in its interpretation of the contract, we vacate the Board's decision and remand for further proceedings.

## BACKGROUND

On February 10, 2003, the VA awarded a contract to Echo Construction Company ("Echo") for the design and construction of electrical improvements at a VA medical center.  On March 31, 2003, Echo, the VA, and Reliable entered into a novation agreement, effectively replacing Echo with Reliable.

The contract required that three backup generators be installed.  Section 1.47 of the contract, entitled "MATERIAL AND WORKMANSHIP," required that "[a]ll equipment, material, and articles incorporated into the work covered by this contract shall be new and of the most suitable grade for the purpose intended, unless otherwise specifically provided in this contract."  J.A. 79.

That section did not define "new." Separately, § 1.79 incorporated Federal Acquisition Regulation ("FAR") 52.211-5 by reference. FAR 52.211-5 contained a separate requirement that supplies called for by the contract be "new, reconditioned, or remanufactured," and it defined "new" to require that the supplies be "composed of previously unused components." *See* 48 C.F.R. § 52.211-5.

Reliable sub-contracted the procurement of the electrical generators to Fisk Electric Company ("Fisk"), which in turn contracted with DTE Energy Technologies, Inc. ("DTE") to provide the generators. On June 26 and 27 of 2004, DTE delivered two Cummins Power Generation ("Cummins") generators to the construction site. Upon delivery, the VA's senior resident engineer, Leonard Romano, inspected the two generators and determined that they were, in his view, not "new." He wrote to Reliable, stating:

> I am concerned that [the two generators that were delivered] are not "new" as required by [§ 1.47(a)]. They show a lot of wear and tear including field burns to enlarge mounting holes. Are they new and will you certify them as such? I cannot pay you for these as planned in this month's payment without that certification.

J.A. 2.

This letter initiated a flurry of letters between Romano, Reliable, Fisk, and DTE, with Fisk and Reliable initially expressing agreement that the generators did not meet the contract specification. For example, on June 28, Fisk wrote to DTE, stating: "[m]y foreman noted that the units were in 'BAD CONDITION' and proceeded to install the units." J.A. 102. Similarly, on June 29, Reliable wrote to Fisk, stating: "[a]s we discussed with you, the equipment on site is clearly unacceptable by anyone's

standards . . . ."   J.A. 109.   On that same day, Reliable wrote to Romano, stating:

> Representatives of Fisk have assured us that they were as surprised as anyone at the condition of the equipment delivered to the site.  We have been working closely with Fisk personnel to investigate the matter and per our conversation have directed them to remove the nonconforming generators from the project site.

J.A. 303.  Both Fisk and Reliable personnel continued to investigate the matter, and Romano continued to assert his belief that the generators were not conforming.

After investigation, Reliable and Fisk came to the conclusion that the generators, which were manufactured in 2000, had been previously purchased by others but never used.  Reliable presented this information to Romano on July 9, but Romano nonetheless rejected the generators, asserting that "[p]revious ownership makes them used."   J.A. 6.   Subsequently, Fisk obtained different generators, which were accepted by the VA and installed.

On April 3, 2007, Reliable submitted a claim to the VA, alleging that the VA had violated the contract and seeking roughly $1,100,000 for additional costs incurred as a result of the VA's rejection of the three original generators.  The VA failed to timely respond, so Reliable appealed to the Board.  On November 27, 2013, the Board denied Reliable's claim, finding that the generators were not "new" because they were not capable of being factory tested.  Reliable appealed to this court.

We have jurisdiction pursuant to 41 U.S.C. § 7107(a)(1)(A).

DISCUSSION

We review questions of law, including interpretations of contracts, de novo. *Rockies Express Pipeline LLC v. Salazar*, 730 F.3d 1330, 1335–36 (Fed. Cir. 2013). We review factual questions for substantial evidence. *Id.* at 1335.

The parties' dispute centers around the contract's requirement that the generators be "new." The Board held, and the VA presently argues, that "new" requires that each generator be "capable of being tested at the factory." J.A. 8. This definition comes from the language of § 1.79, which incorporates FAR 52.211-5's requirement that the generators' supplies "meet contract requirements" to be considered "new," 48 C.F.R. § 52.211-5, and § 16208, which requires that the generators be capable of factory testing.[1] Because the generators left the factory in 2000, the Board reasoned, they were incapable of being factory tested in 2004 and therefore not "new." On the

---

[1]    Section 16208.1.3(E) provides, in relevant part:

Factory Test: The government shall have the option of witnessing the following tests at the factory. . . .

1. Load Test: Shall include six hours of continuous operation; four hours while the set is delivering 100 percent of the specified KW and two hours while delivering 110 percent of the specified KW. . . .

2. Quick Start Test: Record time required for the engine generator set to develop specified voltage, frequency and KW load from a standstill condition.

J.A. 301–02.

other hand, Reliable argues that the contract is clear on its face because § 1.79 provides an express definition of "new": "new" means comprised of unused parts. According to Reliable, because the generators had never been used, they were "new" even though previously owned and damaged by improper storage. We reject both interpretations.

We reject the VA's and the Board's interpretation for two reasons. First, the VA never contemporaneously argued that the generators were non-conforming because they were incapable of being factory tested. Generally, evidence of contemporaneous beliefs about the contract is particularly probative of the meaning of a contract. *See Blinderman Constr. Co. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982) ("It is a familiar principle of contract law that the parties' contemporaneous construction of an agreement, before it has become the subject of a dispute, is entitled to great weight in its interpretation."); *Max Drill, Inc. v. United States*, 427 F.2d 1233, 1240 (Ct. Cl. 1970) (en banc) (per curiam) (expressly adopting Commissioner Stone's view that "[t]he interpretation of a contract by the parties to it before the contract becomes the subject of controversy is deemed by the courts to be of great, if not controlling[,] weight"). Second, the contract required that the generators be capable of a "factory test" but did not expressly require testing be done at the factory at the time the generators were manufactured, nor did it require that testing be done at the factory if the government did not request it. Here, the Board found that that the generators were subsequently tested by Cummins factory-certified technicians, and the VA declined to observe the testing. There is no showing the generators were incapable of being tested at the factory if actual testing at the factory had been requested by the government—which it had not in fact requested.

On the other hand, we reject Reliable's interpretation because it is incomplete. While we agree that generators that had been used would not comply with the contract,[2] we think that the mere fact that the generators were not used does not make them "new." Reliable, aided by the July 8, 2013, affidavit of Fisk's Executive Vice President James Muhl, argues that the generators were "new" because they were not used, and in the industry, "generators are not 'used' until the generators are commissioned[, at which point] the manufacturer pushes out the new equipment warranty and the unit is put into 'service.'" J.A. 234. While Muhl's affidavit speaks to the industry definition of "used," he does not provide an industry definition of "new,"[3] and dictionaries do not define "new" as simply being the opposite of "used."[4] Reliable relies on § 1.79, which incorporated FAR 52.211-5 and defines "new" to mean "composed of previously unused components." 48 C.F.R. § 52.211-5(a). But, by its own terms, that definition is expressly limited to FAR 52.211-5 itself.[5]

---

[2] There is no contention here that the generators were used. The run times demonstrated only that the generators had been tested.

[3] Muhl's statement that, "[i]f the unit has not be[en] 'used', then the unit is 'new,'" was his conclusion with respect to these "particular generator[s]," not a general statement about industry practice. *See* J.A. 234.

[4] If anything, the opposite of "new" tends to be "old," not "used." *See, e.g.*, *Random House Webster's Unabridged Dictionary* 1293 (2d ed. 1999) ("New, fresh, novel describe something that is not old."); *see also Webster's Third New International Dictionary* 1522 (2002).

[5] FAR 52.211-5, incorporated by reference into § 1.79, provides in relevant part:

As noted above, there are two separate "new" requirements, one found in § 1.47 and one found in § 1.79. Section 1.79's "new" requirement focuses on the quality of the components in the generator—the components must be unused. Section 1.47 sets forth a different requirement. Under § 1.47, the generator itself must be "new." And, in that section, "new" is undefined. Reading the contract in this manner—that § 1.47 and § 1.79 set forth separate and distinct "new" requirements—is reinforced by the rule of construction disfavoring surplusage and redundancy. *See Mass. Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1231 (Fed. Cir. 1997) ("It is a fundamental rule of contract interpretation that the provisions are viewed in the way that gives meaning to all parts of the contract, and that avoids conflict, redundancy, and surplusage among the contract provisions."). Reliable's interpretation is incomplete because the "new" requirement under § 1.47 focuses on the generator as a whole, not the component parts. While the parties agree that "new" requires no prior use, there is no justification for treating a generator as new solely because it has not been used.

Because "new," as used in § 1.47, is not defined by the contract and there is no single plain meaning of the word

---

(a) Definitions.  As used *in this clause*—

New means composed of previously unused components, whether manufactured from virgin material, recovered material in the form of raw material, or materials and by-products generated from, and reused within, an original manufacturing process . . . .

. . .

48 C.F.R. § 52.211-5 (emphasis added).

"new," it is ambiguous. It is therefore appropriate to look both to the dictionary definitions of "new" and to industry definitions, standards, and practices. *See C.A. Acquisition Newco, LLC v. DHL Express (USA), Inc.*, 696 F.3d 109, 113–14 (Fed. Cir. 2012) (noting that the trial court "should also consider any relevant industry practices" when resolving ambiguous terms in a contract and looking to dictionary definitions to resolve ambiguities); *Hunt Constr. Grp. v. United States*, 281 F.3d 1369, 1373 (Fed. Cir. 2002) (industry meaning can be used as an interpretative aid in understanding terms in a contract); *see also Nat'l Union Fire Ins. Co. v. Lumbermens Mut. Cas. Co.*, 385 F.3d 47, 55 (1st Cir. 2004) (vacating a district court decision interpreting a contract and remanding for further consideration in light of industry practices).

One possible meaning is the one initially put forth by Romano but subsequently dropped, i.e., that "new" means not previously owned by another. This definition was disputed by Muhl's affidavit. In it, he described that, "[i]n the electrical contracting and construction business, simply being owned and kept in storage by an intermediary does not make a generator 'used' . . . ." J.A. 238. The record evidence shows that generators are not-uncommonly sold through various intermediaries, and, as here, are still entitled to a manufacturer's warranty. In such circumstances, an interpretation that "new" requires that the generators not be previously owned is incorrect. Indeed, the VA no longer argues that this is the meaning of "new" in this context.

"New" could require that the generators be recently manufactured. This has some support in the dictionaries. *See Black's Law Dictionary* 1204 (10th ed. 2014) ("recently come into being <the new car was shipped from the factory this morning>"); *Webster's Third New International Dictionary* 1522 (2002) ("having existed or having been

made but a short time; having originated or occurred lately"). We do not think that this is what the parties intended when they required that the generators be "new." Neither party argues for this meaning, and no evidence was put forth with respect to the average life expectancy of a backup generator, the speed at which generator technology is improving, or the like. Recent manufacture is not a requirement.

"New" could require a fresh condition. Dictionary definitions support this interpretation. *See Webster's Third New International Dictionary* 1522 (2002) (defining "new" to mean: "usu[ally] of superior quality;" "[f]reshness;" "[f]resh in this connection applies to what is new and still retaining a first liveliness, energy, virginal quality, and so on"). We think this definition is appropriate for purposes of § 1.47. There is no testimony as to how, in the industry, a generator can be "new" if it has been severely damaged. It defies logic to conclude that the parties intended to treat seriously damaged generators as "new."

In interpreting "new" to require the generators be "fresh," we do not mean that the generators were required to be entirely free of cosmetic defects. It is entirely foreseeable that slight, superficial damage might occur during shipment or storage, and there is no evidence put forth by either party that the contract intended to define "new" to exclude damage such as paint scratches or light and easily fixable rusting. *See, e.g.*, *Groban v. S.S. Pegu*, 331 F. Supp. 883, 887, 890–91 (S.D.N.Y. 1971) (explaining that tractors exposed to heavy tropical rains during shipment, which resulted in surface damage to the tractors, were still "new"). In our view, "new" requires that the generators must not be used and also must be free of significant damage, i.e., damage that is not cosmetic.

The record evidence before us is conflicting with respect to the extent of the damage, and there was no express finding by the Board on the issue.

While, as noted above, there are unequivocal admissions by Reliable that the generators were significantly damaged and not in conformity with the contract, these statements are not binding judicial admissions. Although this circuit has had limited opportunities to address the doctrine, it is clear from other circuits that judicial admissions, which "have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact," are limited to formal admissions made in, for example, a complaint, answer, or pretrial order. *See Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) (quoting *Dery v. Gen. Motors Corp.* (*In re Fordson Eng'g Corp.*), 25 B.R. 506, 509 (Bankr. E.D. Mich. 1982)).

Although not formal judicial admissions and therefore not binding, contemporaneous admissions by Reliable are nonetheless probative evidence that the generators did not comply with the contract. *See 3M Co. v. Mohan*, 482 F. App'x 574, 579 (Fed. Cir. 2012) (citing a party's apologies to customers for causing confusion as support for the factual finding that the party did cause confusion); *Sutton v. Calhoun*, 593 F.2d 127, 128 (10th Cir. 1979) (affirming the trial court's submission to the jury of the question of how much probative weight should be assigned to an admission of mistake by a doctor in a case alleging negligence on the part of the doctor); *Becton v. Starbucks Corp.*, No. 2:05-CV-1143, 2007 WL 2688128, at *3 (S.D. Ohio Sept. 6, 2007) (admitting a contemporaneous statement by a Starbucks manager apologizing for an improperly secured lid because it was probative of whether the lid was properly secured). It is also significant that Reliable was unwilling at the time of delivery to certify

that the generators were "new" or to characterize them as new.

On the other hand, Muhl, in his July 9, 2013, affidavit, concluded that the damage to the generators was entirely cosmetic. He asserted that the damage to the generators was superficial, consisting of rust, scraped paint, disconnected hoses, and dust, dirt, and grime. According to him, the damage was easily remedied with a "buff and puff" and did not affect the quality of the generators.

There was thus conflicting evidence as to the extent of the damage. There were admissions that the damage to the generators was substantial, but the affidavit from Muhl asserts it was not. In light of the conflicting evidence and lack of fact-finding by the Board on this issue, we remand for the Board to determine whether the damage to the generators during the four-year period between the original manufacture and the date of delivery to the VA site was significant enough to render the generators not "new."

Because our interpretation of "new" includes an analysis of the extent of the damage and whether it can be fully and easily cured, there is no need to address Reliable's economic waste theory, as that doctrine substantially overlaps with whether the generators at issue are "new" under the contract. *See Granite Constr. Co. v. United States*, 962 F.2d 998, 1007–08 (Fed. Cir. 1992) (explaining that rejecting performance of a contract in which the performance is entirely adequate for the purpose of the project is economic waste).

## VACATED AND REMANDED

### COSTS

Costs to neither party.

# United States Court of Appeals for the Federal Circuit

---

**RELIABLE CONTRACTING GROUP, LLC,**
*Appellant*

v.

**DEPARTMENT OF VETERANS AFFAIRS,**
*Appellee*

---

2014-1326

---

Appeal from the Civilian Board of Contract Appeals in No. 3048, Administrative Judge Anthony S. Borwick, Administrative Judge Patricia J. Sheridan, Administrative Judge Stephen M. Daniels.

---

NEWMAN, *Circuit Judge,* dissenting.

The Department of Veterans Affairs ("VA") and Reliable Contracting Group ("Reliable") entered into a contract for construction of a veterans' medical center in Miami, Florida. The contract included the provision and installation of three new backup electrical generators.

The prime contractor Reliable, through a subcontractor and supplier, provided previously owned, rusted, grime-encrusted, four-year-old generators with mounting holes and field burns. The VA on-site engineer observed their condition and objected to their installation. Reliable agreed, and wrote that the generators were "nonconforming" and "clearly unacceptable by anyone's standards,"

and chastised the subcontractor. The subcontractor described the generators as in "bad condition" and chastised the supplier.

Reliable refused to certify the generators as "new" and the VA refused to accept them. Reliable instructed the subcontractor to remove the generators and provide "conforming equipment." The claim here is $1.1 million for the cost of providing the replacement generators. The contracting officer, affirmed by the Civilian Board of Contract Appeals, denied the claim, stating that the generators were not new and that no additional compensation was warranted.

My colleagues on this panel now fault the VA for rejecting the generators without ascertaining whether they might be cleaned up and refurbished. On this reasoning, my colleagues remand to the Board with instructions to determine whether the damage to the generators during the four-year period in which they were improperly stored was "significant enough" to render the generators not new. Maj. op. at 12.

I respectfully dissent.

## DISCUSSION

The Board's findings of fact are final unless they are "fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence." 41 U.S.C. § 609(b) (1982).

No error has been shown in the Board's determination that the generators were not new and that an adjustment was not warranted. The Board noted Reliable's statements that the generators were "nonconforming" and "clearly unacceptable by anyone's standards." The contract is explicit as to the requirement for new generators. Section 1.47 of the contract states:

(a) all equipment, material, and articles incorporated into the work covered by this contract shall be new and of the utmost suitable grade for the purpose intended, unless otherwise specifically provided in this contract.

The Board observed that neither Reliable nor its subcontractor characterized the generators as new, and that both refused to so certify.

My colleagues on this panel hold that "new" includes previously owned generators if they are in "fresh condition," unused, and free of "significant damage." Maj. op. at 10. Whatever may be the applicability of such a standard to other facts, these generators showed more than "slight, superficial damage." *Id.* The absence of "freshness" of these begrimed, four-year-old, "inadequately stored," previously owned generators was not plausibly disputed. No error in fact or law has been shown in the Board's determination that these generators were not new, on any reasonable standard of newness.

Indeed, the panel majority refers to the "unequivocal admissions by Reliable that the generators were significantly damaged and not in conformity with the contract." *Id.* at 11. However, the majority relieves the contractor of these admissions because they were not "binding judicial admissions" in formal court documents, but were made only in contemporaneous written records. *Id.* No basis has been shown for excluding this evidence.

The panel majority further errs in ruling that the correct interpretation of "new" in government contracts or under the FAR includes previously owned and damaged equipment if the damage "can be fully and easily cured." *Id.* at 12. Old and damaged equipment does not become new if the damage can be cured. There was no obligation, in law or equity, for the VA to determine whether these admittedly "nonconforming" generators could be cleaned

up and refurbished. The additional costs of contract compliance are not the obligation of the agency.

The Board's denial of the requested adjustment is correct, and is well supported in fact and law. There is no reasonable basis for further proceedings on this claim. From my colleagues' contrary ruling, I respectfully dissent.