(No. 54568.—

WARREN S. PARK *et al.*, Appellees, v. DENNIS P. SOHN
*et al.*, Appellants.

*Opinion filed March 16, 1982.*

454

H. Wayne Carmichael, of Groen, Groen & Carmichael, of Pekin, for appellants.

Harold H. Kuhfuss, of Kuhfuss & Kuhfuss, of Pekin, for appellees.

JUSTICE WARD delivered the opinion of the court:

The plaintiffs, Warren and Josephine Park, brought an action against the defendants, Dennis Sohn and his wife, for damages because of defects in the house sold to them by the defendants. Their complaint set out two counts: The first alleged that the plaintiffs were defrauded into making the purchase through the defendants' misrepresentations of facts and failure to disclose defective conditions. The second alleged that the defendants had breached a warranty of habitability implied in the sale of the house. After a bench trial in the circuit court of Tazewell County, the court entered judgment in favor of the plaintiffs on both counts. The appellate court reversed the judgment as to count I. The court reversed as to count II and remanded the cause for a new trial as to damages only. (90 Ill. App. 3d 794.) We granted the defendants' petition for leave to appeal under Rule 315 (73 Ill. 2d R. 315).

On May 25, 1973, the defendants purchased the lot upon which the house was constructed. They built the house and moved in sometime in August 1974, although it appears from the testimony of Dennis Sohn that construction work on the house was still being performed in the summer of 1975. Prior to moving in, the defendants lived in another house that Sohn had constructed. He was not a full-time builder, but since building the plaintiffs' house he has constructed six other houses. It appears that he was trained in construction work by his father, who assisted him in the building of the house sold to the plaintiffs. Mr. Sohn testified that the house was listed with a realtor for sale before he and his wife moved in, although he contradicted that statement in response to leading questions by his attorney. Mrs. Sohn testified that the house was listed with a realtor sometime prior to

August 22, 1974.

The defendants sold the house to the plaintiffs in October 1976. Since April or May 1976, Mr. Sohn had represented or advertised himself as a general contractor by word of mouth. There was no evidence at trial that the defendants or their realtors had made any representations to the plaintiffs about the existence of a sump pump in the backyard, or about water seepage into the crawl space below the house. Mrs. Sohn had told the plaintiffs that the defendants had had no problem with the septic system except that it had once become clogged when a child flushed a popsicle stick into it.

On November 13, 1976, an electrician working beneath the house informed the plaintiff, Warren Park, that there was water in the crawl space. Park investigated the situation, and he discovered a dry well with a sump pump in a hill about 20 feet from the house. There was conflicting testimony as to whether the cover of the pump was visible from the house. The realtor who had shown the plaintiffs the property testified that he had not seen it. The pump had been installed by the defendants in 1975 to prevent surface water from accumulating along the edge of a road located upon ground above the house. The pump was not working when Park discovered it. He testified, though, that the pump was connected and that power was flowing to it. He purchased a new pump for $80.31 and installed it. He testified that the new pump did not completely solve the water problem because puddles continued to form in the crawl space under the house, causing odors. The plaintiffs paid $627 to install two trenches with drain tile in the rear of the house for additional drainage. Also, they were required to use dehumidifiers.

In the summer of 1977, the plaintiffs learned that the sump pump is actually located upon the land of an adjoining landowner. The area in which the pump was located had been sodded, and shrubbery had been placed there by

the defendants. This had given the plaintiffs the impression that the area was part of the lot they were purchasing. The plaintiffs admitted, however, that no one had told them that the lot extended to the area where the pump was located, and no contention was made that the description in the deed and contract was incorrect.

Moreover, their house actually was located in violation of a subdivision lot-line restriction. A sidewalk and a drain for their eaves encroached upon the adjoining landowner's property. The plaintiffs bought a portion of the adjoining lot for $4,000 from the owner, although it appears that the plaintiffs purchased somewhat more land than was required to conform to the restriction and to acquire the sump pump area. In addition, the plaintiffs altered the drain of the eaves to direct it away from the adjoining property.

The plaintiffs also experienced difficulties with the septic system. In the spring of 1977 sewage appeared on their lawn. They had the septic tank repeatedly pumped, but a flow of sewage into the lawn and street, causing odors, continued. A contractor testified it would cost approximately $4,500 to eliminate the problem in accordance with recommendations made by the Tazewell County health department. This work would entail completely removing the present seepage-field system and installing a sand filter, which has an overflow-type system. A change of systems would be necessary because underground water that surfaced at different times of the year interfered with the seepage-field system.

At the time the house was built, some other homes in the area had seepage-field systems. Sohn testified that a sand-filter system could not have been installed by him because he did not have a drainage easement, which was needed for that kind of system. The contractor, who testified for the plaintiffs, agreed that an easement would have been necessary. Sohn also testified that when the

house was being constructed a health inspector told him that the seepage system was being conditionally approved, but he warned that it might or might not prove to be inadequate. The inspector said that if there were to be problems with it they would soon manifest themselves. Sohn and his wife testified that they had experienced no problems with the septic system while living in the house, except when the sewer connecting the house and the septic tank had become clogged by a popsicle stick. They, therefore, had no knowledge of a defect.

On March 16, 1979, the trial court entered judgment for the plaintiffs for $4,000 on count I of their complaint, which alleged fraud by misrepresenting or concealing the claimed defects. The court entered judgment for the plaintiffs for $2,707.31 on count II, which alleged a breach by defendants of an implied warranty of habitability. As we have stated, the appellate court reversed the judgment on the first count and held that the amount of damages awarded on the second count was inadequate and remanded the cause for a new trial on the question of damages.

The reversal as to the fraud count was proper. There was no evidence that the defendants made any representation to the plaintiffs that they knew to be false, nor was there evidence that they knowingly concealed defects from the plaintiffs. We agree with the appellate court that the plaintiffs failed to show *scienter*, an essential element of actionable fraud. *Soules v. General Motors Corp.* (1980), 79 Ill. 2d 282, 286 (fraudulent misrepresentation consists of a false statement of a material fact known or believed to be false by the maker); *Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 332 (*scienter* is an element of an action for fraud); *Semmens v. Semmens* (1979), 77 Ill. App. 3d 936, 940 (concealment, to constitute fraud, must be proved to have been done with the intent to deceive under circumstances creating

an opportunity and duty to speak).

We reject the plaintiffs' argument that the defendants are liable for misrepresentation because shrubbery they had planted was mistakenly planted beyond the lot line. The plaintiffs contend that the placement of the shrubbery was tantamount to a pointing out to them of the boundary, upon which representation they relied. There is, however, no evidence that the defendants or their realtors ever indicated to the plaintiffs that the shrubbery demarcated the lot, or that the defendants had that intention. There is no indication that the plaintiffs ever requested the defendants to point out to them the lot line. In such circumstances, we do not think that the defendants could be considered as having made a false representation of the lot line to the plaintiffs. *Cf. Malchow v. Tiarks* (1970), 122 Ill. App. 2d 304 (seller's agent's statement to buyer that a particular stake marked the boundary of lot being purchased was an assumption of a duty to locate the boundary correctly).

The appellate court was correct in its holding that the trial court's judgment for the plaintiffs on the second count should be affirmed, except on the question of damages. Here there was an implied warranty of habitability, which this court recognized in *Petersen v. Hubschman Construction Co.* (1979), 76 Ill. 2d 31, and the evidence showed it was breached.

Prior to the decision of this court in *Petersen,* decisions of the appellate court were in conflict as to the existence and scope of the warranty. (See generally Roeser, *The Implied Warranty of Habitability in the Sale of New Housing: The Trend in Illinois,* 1978 S. Ill. U. L.J. 178, 186-91.) The specific language this court used in *Petersen* was: "[I]n the sale of a new house by a builder-vendor, there is an implied warranty of habitability which will support an action against the builder-vendor by the vendee for latent defects and which will avoid the unjust results

of *caveat emptor* and the doctrine of merger." (76 Ill. 2d 31, 39-40.) That warranty, implied in the contract of sale, was that the house, when conveyed, would be reasonably suited for its intended use. 76 Ill. 2d 31, 42.

The defendants make several contentions of error by the trial court in finding them liable for breach of the implied warranty. First, they argue that they could not be considered builder-vendors for purposes of the warranty. They say that the warranty is implied only in sales by those vendors who are mass producers of houses. We cannot accept so narrow a definition. See *McDonald v. Mianecki* (1979), 79 N.J. 275, 293, 398 A.2d 1283, 1292 (implied warranty applies regardless of whether a builder-vendor is a "mass producer").

Courts have defined the builder-vendor as one who is engaged in the business of building, so that the sale is of a commercial nature, rather than a casual or personal one. See, *e.g., Elderkin v. Gaster* (1972), 447 Pa. 118, 123 n.10, 288 A.2d 771, 774 n.10 (a builder-vendor is "one who buys land and builds homes upon that land for purposes of sale to the general public"); *Hartley v. Ballou* (1974), 286 N.C. 51, 62, 209 S.E.2d 776, 783 (warranty arises in contracts for sale where the vendor is "in the business of building such dwellings"); *Klos v. Gockel* (1976), 87 Wash. 2d 567, 570, 554 P.2d 1349, 1352 (the essence of the implied warranty requires that the builder-vendor be one "regularly engaged in building," so that the sale is commercial in nature).

This "commercial" requirement, however, does not demand that the builder-vendor have a long and extensive experience in the construction industry. There would be an unsupportable and unjust discrimination in offering less protection to purchasers from a builder who has recently entered the construction business than to those purchasers who purchase from the same builder after his business has become established. It has been held that

even a builder constructing his first house may be considered to be in the business of building if the primary reason for constructing the house was to sell it. (*Mazurek v. Nielsen* (1979), 42 Colo. App. 386, 388, 599 P.2d 269, 271.) Moreover, the sale of a house by its builder has been held to be a commercial sale even though the builder began construction for use by his own family, but in the course of construction decided to sell the house upon completion. *Sloat v. Matheny* (Colo. 1981), 625 P.2d 1031.

Here, there was sufficient evidence to regard Sohn as a builder-vendor. He had built one house before he constructed the one here, and he went on to build six more houses prior to the time of trial. It was not necessary that he have been a full-time professional builder. Sohn testified that he did not build the house for the purpose of selling it. Nevertheless, both he and Mrs. Sohn testified that the house was listed for sale by the end of August 1974, and Sohn testified also that work was still being done on the house to complete it in the summer of 1975.

We cannot accept the defendants' second contention that the plaintiffs had to prove that they in fact relied upon Sohn's skill as a builder in making their decision to purchase. The warranty of habitability was recognized because there is implicit reliance on a builder-vendor in the purchase of a house, and habitability is the justifiable expectation of any purchaser of what is proposed to be a residence. As the court put it in *McDonald v. Mianecki* (1979), 79 N.J. 275, 289, 398 A.2d 1283, 1290:

> "Clearly every builder-vendor holds himself out, expressly or impliedly, as having the expertise necessary to construct a livable dwelling. It is equally as obvious that almost every buyer acts upon these representations and expects that the new house he is buying, whether already constructed or not yet built, will be suitable for use

as a home. Otherwise, there would be no sale."

The contention that the house here was not "new" within the meaning of the implied warranty in the sale of new houses, as the defendants had lived in the house for approximately two years before the sale, is not, considering the circumstances, persuasive. The holding in *Petersen* does not require that the house be sold at the time the last nail is put into place for the warranty to be effective. Rather, whether the house is new for purposes of the issue of a warranty is a question of fact to be determined on a case-to-case basis. Here, Sohn testified that the construction of the house had not yet been completed in the summer of 1975. The sale took place in October 1976. We cannot say there was error in regarding the house as new.

Moreover, that the defendants resided in the house before the sale did not deprive the plaintiffs of the protection of the warranty. (See *Mazurek v. Nielsen* (1979), 42 Colo. App. 386, 599 P.2d 269 (fact that builder-vendor lived in the completed house approximately two years prior to sale did not preclude assertion of warranty); *De Roche v. Dame* (1980), 75 App. Div. 2d 384, 430 N.Y.S.2d 390 (brief and temporary occupancy by builder-vendor did not deprive purchasers of the implied warranty). Sohn testified that he listed the house for sale prior to moving in. He later contradicted the statement; the question of credibility was for the trier of fact. To hold that the warranty was not in effect simply because the defendants had occupied it for a time would provide builders with a simple artifice for avoiding the warranty.

Finally, the defendants contend that recovery should be denied because the plaintiffs did not plead and prove that they made a diligent inspection of the premises, and that the defects complained of were not observable from that inspection. The contention is based on a misunderstanding of language in *Petersen*. *Petersen* recognized an action for "latent defects" that frustrated or interfered

with the buyer's expectation of a house reasonably fit for habitation. A latent defect has been defined, the defendants say, as one that cannot be discovered in an ordinarily careful inspection. (*McGourty v. Chiapetti* (1962), 38 Ill. App. 2d 165, 174; *Smith v. Morrow* (1923), 230 Ill. App. 382, 390.) Obviously, however, this court in *Petersen* did not speak of latent defects in that sense. If it had, it would not have recognized a breach of the warranty, because the defects of which the plaintiff complained—a basement floor pitched in the wrong direction, deterioration and nailpopping in the dry wall on the interior, an ill-fitting bay window—were not latent defects according to that definition.

Instead, latent defects would include defects that were not apparent to the purchaser on viewing the property. That meaning of the term is more consistent with the premise on which the warranty is founded—that the purchaser typically is unskilled in the building trade and must rely on the training, knowledge and skill of the builder-vendor.

The last question to be considered is the remedy for a breach of the warranty. In *Petersen,* the defects were substantial and were discovered before the conveyance to the purchasers had been completed. This court allowed the purchasers to rescind their contract and to recover a money judgment for their earnest money and for the labor and materials they supplied. 76 Ill. 2d 31, 44.

Here the plaintiffs brought an action seeking damages for defects found after the conveyance of the property. The recovery of damages is an appropriate remedy. The measure of damages should be the cost of correcting the defective conditions. If, however, the defects could be corrected only at a cost unreasonably disproportionate to the benefit to the purchaser, or if correcting them would entail unreasonable destruction of the builder's work, the amount by which the defects have reduced the value of

the property should be the measure of damages. See *Mason v. Griffith* (1917), 281 Ill. 246, 256; *Witty v. C. Casey Homes, Inc.* (1981), 102 Ill. App. 3d 619, 624-26; *Hanavan v. Dye* (1972), 4 Ill. App. 3d 576, 580.

The appellate court correctly held that the cause should be remanded for a new trial on the issue of damages only. The trial court awarded $2,707.31 for breach of the implied warranty. From the record, it is clear that the court could not have awarded damages in that amount had it applied the measure of damages we have just described.

The appellate court, while it reversed the judgment on count II, said that the trial court had properly entered judgment for the plaintiffs. (90 Ill. App. 3d 794, 799.) The court stated that it reversed and remanded for a new trial as to damages only. (90 Ill. App. 3d 794, 799.) We consider it would have been preferable for the court to have affirmed the trial court's judgment on the question of liability, to have vacated the portion of the judgment awarding damages, and to have remanded for a new trial on the question of damages only.

For the reasons given, we affirm the judgment of the appellate court as to count I and reverse its reversal as to count II. The judgment of the circuit court is reversed as to count I and, with respect to count II, is affirmed as to liability and vacated as to damages. The cause is remanded to the circuit court for a new trial, in accordance with this opinion, on the issue of damages only.

*Appellate court affirmed in part and reversed in part; circuit court affirmed in part, vacated in part, and reversed in part; cause remanded, with directions.*