688 P.2d 693

**Glenn F. DILLIG, Plaintiff/Appellee,**

**v.**

**Roger A. FISHER and Pansy L. Fisher, his wife, Defendants/Appellants.**

**No. 2 CA–CIV 5024.**

Court of Appeals of Arizona, Division 2.

April 26, 1984.

Review Denied Sept. 25, 1984.

48

Kenet E. Chareau, Tucson, for plaintiff/appellee.

Aboud & Aboud, P.C. by John Aboud, Sr., Tucson, for defendants/appellants.

## OPINION

HOWARD, Judge.

This appeal requires us to consider the scope of the doctrine of implied warranty of habitability adopted by Division One of this court in *Columbia Western Corp. v. Vela,* 122 Ariz. 28, 592 P.2d 1294 (App. 1979) and implicitly approved by the Supreme Court in *Richards v. Powercraft Homes, Inc.,* 139 Ariz. 242, 678 P.2d 427 (1984). Sometime in 1979, appellant Roger A. Fisher commenced construction of a single family residence on a lot owned by appellants in Sierra Vista. Appellants had recently moved to Arizona from Ohio, where Fisher had worked as a general contractor and had supervised the construction of approximately 40 homes. At the time the Sierra Vista home was constructed, however, Fisher was employed at Davis-Monthan Air Force Base and was not licensed as a contractor in Arizona. It is undisputed that the house was built with the intention that it would serve as the Fishers' personal residence but that the family subsequently decided to remain in Tucson and never occupied the house. Several months after construction was completed, the house was listed for sale with a Sierra Vista realtor.

On June 25, 1980, the parties executed a standard form deposit receipt and agreement, pursuant to which appellee Dillig agreed to purchase the house for the sum of $62,000. The agreement does not identify the builder of the house, and Dillig testified that he was not made aware that Fisher had constructed the house himself until the agreement was executed. Dillig took possession on June 30, 1980, and almost immediately began to encounter numerous problems with the construction of the house, the most significant of which pertained to an allegedly improperly constructed roof which permitted water to leak into the house. Although at Dillig's request Fisher came down to Sierra Vista to inspect the roof, and at that time recaulked the edges, he told Dillig that he could not find any leaks and subsequently denied responsibility for any repairs.

This action was commenced in December 1981. Although Dillig's amended complaint sets forth two counts, alleging what Dillig characterizes as a breach of express warranty as well as an implied warranty of habitability, Dillig concedes that the former claim was abandoned. During the trial to

the court, considerable evidence was introduced concerning not only the alleged defects in the roof, but also numerous other defects in construction. The court rendered judgment in favor of Dillig in the amount of $3,350, together with interest at the rate of 10 per cent per annum, $658.35 in costs, and $5,743 in attorney's fees. Although the court made no findings of fact, the damage award coincides with the cost estimate for replacing the roof. Dillig's cost estimates of other repairs were not admitted into evidence, and since there was no other evidence to quantify damage allegedly resulting from other defects, we assume that the damages awarded pertain only to the roof. Dillig has not cross-appealed.

The Fishers raise the following issues on appeal: (1) Does the evidence support any claim that express warranties were made as to the quality or condition of the house sold? (2) Do the evidence and the law support the imposition of any implied warranties as to the quality or condition of the house sold, which was a single house built by the homeowner for his own use without a contractor's license? (3) Does the evidence support a finding that the subject house was not habitable by reason of rain leaks, and that the leaks necessitated entire new roofing? (4) Were the attorney's fees reasonable or lawfully granted?

As to the first issue, appellee has conceded that the first count of his complaint was abandoned and that the case was tried solely on the theory of an implied warranty.

In *Columbia Western Corp. v. Vela,* supra, rejecting the traditional rule of caveat emptor, the court held "as to new home construction, that the builder-vendor impliedly warrants that the construction was done in a workmanlike manner and that the structure is habitable." 122 Ariz. at 33, 592 P.2d 1294. The court further held that the builder does not escape such warranties merely because a sale puts the purchaser in a position to discover the defects. The rationale for this rule was succinctly stated by the Supreme Court in *Richards v. Powercraft Homes, Inc.,* supra: "that house-

building is frequently undertaken on a large scale, that builders hold themselves out as skilled in the profession, that modern construction is complex and regulated by many governmental codes, and that homebuyers are generally not skilled or knowledgeable in construction, plumbing, or electrical requirements and practices ...." The issue for our determination is whether these considerations pertain in the circumstances presented by this case.

Appellants urge that the criteria for imposition of the implied warranty are not met here because Fisher was not a mass builder, but rather constructed the house for his own personal use and not for resale. The courts considering this question in other jurisdictions have consistently held that the seller's intent or purpose in constructing and selling a house is the critical issue in determining whether the sale is subject to the implied warranty of habitability. *Capra v. Smith,* 372 So.2d 321 (Ala.1979); *Sloat v. Matheny,* 625 P.2d 1031 (Colo. 1981); *Mazurek v. Nielsen,* 42 Colo.App. 386, 599 P.2d 269 (1979); *Park v. Sohn,* 89 Ill.2d 453, 60 Ill.Dec. 609, 433 N.E.2d 651 (1982); *Bolkum v. Staab,* 133 Vt. 467, 346 A.2d 210 (1975). As the court stated in *Park v. Sohn,* supra:

"Courts have defined the builder-vendor as one who is engaged in the business of building, so that the sale is of a commercial nature, rather than a casual or personal one.

This 'commercial' requirement, however, does not demand that the builder-vendor have a long and extensive experience in the construction industry. There would be an unsupportable and unjust discrimination in offering less protection to purchasers from a builder who has recently entered the construction business than to those purchasers who purchase from the same builder after his business has become established. It has been held that even a builder constructing his first house may be considered to be in the business of building if the primary reason for constructing the house was to sell it. (*Mazurek v. Nielsen*

(1979), 42 Colo.App. 386, 388, 599 P.2d 269, 271.) Moreover, the sale of a house by its builder has been held to be a commercial sale even though the builder began construction for use by his own family, but in the course of construction decided to sell the house upon completion. *Sloat v. Matheny* (1981), Colo., 625 P.2d 1031." 60 Ill.Dec. at 613, 433 N.E.2d at 655.

Our research has revealed only two cases in which the sale of a residence constructed under circumstances similar to the present ones has been held not to be subject to an implied warranty. In *Klos v. Gockel*, 87 Wash.2d 567, 554 P.2d 1349 (1976), the court found the sale of a residence not to be commercial, and therefore not subject to the implied warranty, where the builder had occupied the house for two years prior to the sale and "there was nothing in appellant's conduct that should have created any sort of belief by respondents that this was a commercial sale." 554 P.2d at 1352.

In *Schepps v. Howe*, 665 P.2d 504 (Wyo. 1983), the partially completed structure was expressly listed, advertised and sold by the seller, who had no previous experience in construction, in an "as is" condition. The evidence showed that this provision had been specifically brought to the buyers' attention and that they had agreed to it. Under these circumstances, the court held that any implied warranty of habitability had been waived by the buyers. The court went on to indicate, however, that in the absence of the waiver, and if the house had been completed prior to sale, the result would have been different.

"It makes sense in the case of a completed structure to apply the same rules to those building for commercial sale and those who build for their own use and later sell. The buyer in either instance has the same problem of discovery of latent defects. In a case such as this in which the structure is not completed the defects are discoverable ...." 665 P.2d at 510.

▮ We agree that the rationale underlying the implied warranty of habitability supports its application to situations, such as the present one, where a completed structure which has never been occupied is placed on the market for sale. We see no basis for distinguishing between the mass builder and the occasional builder in this context, nor do we deem it relevant that the house was originally constructed for the Fishers' personal use, and was the only house constructed by Fisher in Arizona. Assuming that the roof was defectively constructed and caused the leakage, Dillig was in no position to be able to discover the defect prior to the sale. We therefore hold that the sale of the house to Dillig was a commercial sale of a new residence by a builder-vendor and was subject to the implied warranty that the house was constructed in a workmanlike manner and was habitable. See *Columbia Western Corp. v. Vela*, supra. Since there was nothing in the standard form agreement that would have alerted Dillig to the possibility that the Fishers would disclaim responsibility for their work, we are not required to decide whether a builder-vendor may avoid all liability for defective construction through the use of express disclaimers of warranty.

▮ Appellants next argue that the evidence was insufficient to support a finding that the house was not habitable as a result of the leaking roof. We note initially that Dillig was not required to prove that the house could not be lived in as a result of the leaks. It was sufficient if the evidence established that the roof was not constructed in a workmanlike manner and that he was thereby damaged. The first element was established by the testimony of two witnesses with extensive experience in the roofing business who testified that they were familiar with the standard for roof construction in Cochise County and that this roof did not meet that standard because it had been constructed without a layer of felt in between the plywood sheeting and the asphalt shingles. They also testified that such construction was contrary to the Uniform Building Code, which they testified had been continuously

adopted as the Sierra Vista city building code. There was further testimony that the purpose of the felt was to serve as a moisture barrier, causing any water which might leak through the shingles to run off the roof rather than sinking into the plywood sheeting. From this testimony, the court could reasonably conclude that the roof was not constructed in a workmanlike manner.

■■■ The evidence pertaining to causation is less substantial. Dillig testified that in July 1981 the ceiling in the dining room "was running in a streak and soaking wet." He further testified that it continued to leak despite Fisher's caulking and the repair of part of the roof by a roofing company. Fisher testified that when he came to the house in July 1981, he saw water spots on the wall, but had no idea what the source was. Neither of Dillig's roofing experts testified directly as to any personal knowledge of the source of the water spots, or that the roof in fact leaked. In response to questioning by appellants' counsel, one witness testified as follows:

"Q. Now Mr. Martin, is it not true that that section—you have assumed, have you not, that that section was torn up because that is the section that must have leaked, is that correct?

A. Yes, sir.

Q. You don't know whether it leaked or didn't leak, did you?

A. No."

On appeal from the judgment of a court sitting without a jury, where the court has not been requested to make findings of fact and conclusions of law, all reasonable inferences must be taken in favor of the appellee, and if there is any evidence to support the judgment, it must be affirmed. *United States Fidelity & Guaranty Co. v. Davis*, 3 Ariz.App. 259, 413 P.2d 590 (1966). We believe there was sufficient evidence from which the court could conclude that there was water leaking into the house, and that the leakage came from the roof. Further, the leakage having commenced within a year and a half after construction was completed, we believe the court could reasonably conclude that the leak was caused by the initially defective construction of the roof.

■■■ Appellants also contend that there was insufficient evidence that the entire roof needed to be replaced. Fisher testified, however, that he was unable to find the source of the leakage after an inspection of several hours. This testimony, coupled with the evidence that the entire roof was not in compliance with the city building code and that a previous partial repair was unsuccessful, warranted the conclusion that a new roof was required to correct the problem.

■■■ Finally, appellants argue that the attorney's fees awarded by the court exceeded the limitation in A.R.S. § 12–341.-01(B) of "the amount paid or agreed to be paid," and alternatively were unreasonable as being far in excess of the amount of actual damages recovered. While appellants' first point has merit, in that Dillig introduced no evidence as to his fee agreement with counsel, appellants did not raise this argument before the trial court and therefore cannot raise it for the first time on appeal. *Fendler v. Phoenix Newspapers Inc.*, 130 Ariz. 475, 636 P.2d 1257 (App.1981). Similarly, although appellants objected to the amount as "highly exorbitant," no evidence was presented in support of this claim or as to an amount which would have been reasonable under the circumstances. Having failed to offer any evidence to controvert the affidavit of Dillig's counsel, appellants cannot be heard to complain of the amount awarded by the trial court.

■■■ The judgment of the trial court is affirmed. This appeal being a "contested action arising out of a contract," A.R.S. § 12–341.01, appellee's request for attorney's fees and costs on appeal is granted. The amount will be determined by the court upon submission of a statement of costs in accordance with Rule 21(c), Rules of Civil Appellate Procedure, 17A A.R.S.

BIRDSALL, C.J., and HATHAWAY, J., concur.