# Illinois Official Reports

## Supreme Court

---

**Sienna Court Condominium Ass'n v. Champion Aluminum Corp.,**
**2018 IL 122022**

---

| | |
|---|---|
| Caption in Supreme Court: | SIENNA COURT CONDOMINIUM ASSOCIATION, Appellee, v. CHAMPION ALUMINUM CORPORATION *et al.* (BV and Associates, Inc., *et al.*, Appellants). |
| Docket No. | 122022 |
| Filed | December 28, 2018 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Margaret Brennan, Judge, presiding. |
| Judgment | Certified question answered. <br> Appellate court judgment reversed. <br> Circuit court judgment reversed. <br> Cause remanded. |
| Counsel on Appeal | Brian Shaughnessy, of Cremer, Spina, Shaughnessy, Jansen & Seigert, LLC, Robert J. Franco and Christopher M. Cano, of Franco & Moroney, LLC, Kimberly A. Jansen, Steven R. Bonanno, and Anne C. Couyoumjian, of Hinshaw & Culbertson LLP, and Christopher M. Goodsnyder, of Perl & Goodsnyder, Ltd., all of Chicago, for appellants. |

Saul Ewing Arnstein & Lehr LLP, of Chicago (Hal R. Morris, W. Matthew Bryant, Elizabeth A. Thompson, and Michael A. Jacobson, of counsel), for appellee.

Justices

JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Thomas, Garman, Theis, and Neville concurred in the judgment and opinion.

Justice Kilbride dissented, with opinion.

## OPINION

¶ 1    In this case, we must determine whether the purchaser of a newly constructed home may assert a claim for breach of an implied warranty of habitability against a subcontractor who took part in the construction of the home, where the subcontractor had no contractual relationship with the purchaser. For the following reasons, we hold that the purchaser may not.

¶ 2                                   Background

¶ 3    The plaintiff, Sienna Court Condominium Association, is a condominium association governing the Sienna Court Condominiums, a two-building, 111-residential-unit property located in Evanston, Illinois. In 2013, plaintiff filed a verified complaint in the circuit court of Cook County on behalf of the individual unit owners in the condominium buildings. In its complaint, plaintiff alleged that Sienna Court Condominiums was a newly constructed property developed by TR Sienna Partners, LLC (TR Sienna), and that TR Sienna had marketed and sold the buildings' condominium units to individual purchasers. Plaintiff further alleged that, at the time the units were sold by TR Sienna to their purchasers, the condominium buildings contained a number of latent defects that resulted in water infiltration and other conditions that rendered both the individual units and common areas of the buildings unfit for their intended purpose of habitation.

¶ 4    As ultimately amended, plaintiff's complaint contained 10 counts. Count I of the complaint alleged breach of an express warranty against TR Sienna. The remaining nine counts of the complaint asserted claims for breach of an implied warranty of habitability against (1) TR Sienna; (2) the general contractor; (3) the architect and engineering design firms; (4) material suppliers and (5) several subcontractors, including the defendants in this case, Don Stoltzner Mason Contractor, Inc.; BV and Associates, Inc., d/b/a Clearvisions, Inc.; Lichtenwald-Johnston Ironworks Company; and Metalmaster Roofmaster, Inc. Relevant to the issues in this case, the complaint alleged that each condominium unit and the common elements of the buildings were subject to an implied warranty of habitability extending from "each and every subcontractor" and that the subcontractors had therefore warranted that the buildings, or the portions constructed by them, would be suitable and fit for their intended purpose of habitation.

- 2 -

¶ 5 Prior to the filing of plaintiff's complaint, both TR Sienna and the general contractor were declared bankrupt by order of the United States Bankruptcy Court for the Northern District of Illinois. Plaintiff sought and was granted relief from the automatic bankruptcy stay so that it could pursue its claims against TR Sienna and the general contractor to the extent of their available insurance. See 215 ILCS 5/388 (West 2010) (the bankruptcy or insolvency of an insured shall not relieve the insurer from its liabilities in case of any loss occasioned during the term of the policy). Subsequent discovery revealed that TR Sienna and the general contractor both had two separate insurance policies, each providing coverage of $1 million per occurrence with $2 million aggregate limits. Discovery further revealed that plaintiff had recovered approximately $308,000 from TR Sienna through a warranty escrow fund that TR Sienna had been required to establish under a City of Evanston ordinance.

¶ 6 Defendants and the material suppliers filed a joint motion to dismiss counts III through VI and count IX of plaintiff's complaint (the counts that were directed against them), asserting that they were not subject to an implied warranty of habitability. At subsequent hearings on this motion, the parties' discussion centered largely on the appellate court's decision in *Minton v. The Richards Group of Chicago*, 116 Ill. App. 3d 852 (1983). In *Minton*, the appellate court held that, where the purchaser of a newly constructed home "has no recourse to the builder-vendor and has sustained loss due to the faulty and latent defect in their new home caused by the subcontractor, the warranty of habitability applies to such subcontractor." *Id.* at 855. Focusing on the word "recourse," defendants argued that the plaintiff in this case had recourse from TR Sienna in the form of insurance policies and the warranty escrow fund and, therefore, under *Minton*, no implied warranty of habitability could exist. Plaintiff, in contrast, contended that the existence of potential or actual recourse from the developer-vendor was not the determinative factor in establishing an implied warranty of habitability with a subcontractor. Rather, according to plaintiff, the only relevant factor was whether the developer-vendor had been declared legally insolvent. Because that had occurred here, plaintiff maintained that an implied warranty of habitability existed with defendants.

¶ 7 The circuit court denied defendants' motion to dismiss. Thereafter, defendants moved for the circuit court to certify that its order denying the motion merited discretionary appeal under Illinois Supreme Court Rule 308 (eff. Feb. 26, 2010), because it involved questions of law to which there was a substantial dispute and the resolution of the questions would materially advance the litigation. The circuit court granted that request and, as required under the rule, identified the pertinent questions of law as follows:

"a) Does the existence of an insolvent developer's and/or insolvent general contractor's liability insurance policy(ies) bar a property owner from maintaining a cause of action for breach of implied warranty of habitability against subcontractors and/or material suppliers, which are not in privity with the property owner, under *Minton v. Richards*, 116 Ill. App. 3d 852 (1st Dist. 1983) or its progeny?

b) Does the potential recovery against an insolvent developer's and/or, insolvent general contractor's liability insurance policy(ies) constitute 'any recourse' under *Minton v. Richards*, 116 Ill. App. 3d 852 (1st Dist. 1983) or its progeny, thereby barring a property owner's cause of action for breach of implied warranty of habitability against subcontractors and/or material suppliers, which are not in privity with the property owner?

- 3 -

c) Does the actual recovery of any proceeds from an insolvent developer's 'warranty fund,' which was funded by the now insolvent developer with a percentage of the sales proceeds from the sale of the property, bar a property owner from maintaining a cause of action for breach of implied warranty of habitability against subcontractors and/or material suppliers, which are not in privity with the property owner, under *** *Minton v. Richards*, 116 Ill. App. 3d 852 (1st Dist. 1983) or its progeny?

d) Does the actual recovery of any proceeds from an insolvent developer's 'warranty fund' constitute 'any recourse' under *Minton v. Richards*, 116 Ill. App. 3d 852 (1st Dist. 1983) or its progeny, thereby barring a property owner's cause of action for breach of implied warranty of habitability against subcontractors and/or material suppliers, which are not in privity with the property owner?"

¶ 8 The appellate court granted leave to appeal. The Rule 308 appeal was consolidated with two additional appeals: (1) an appeal by the plaintiff of an order dismissing its claims for breach of an implied warranty of habitability against the architect, engineering design firms, and material suppliers and (2) an appeal from the general contractor of an order dismissing its counterclaims against the subcontractors and material suppliers. 2017 IL App (1st) 143364.[1]

¶ 9 With respect to defendants' Rule 308 appeal, the appellate court held that legal insolvency, rather than an inquiry into the availability of recourse, determines whether a claim for breach of an implied warranty of habitability may be asserted against a subcontractor. *Id.* ¶¶ 75-99. The appellate court also rejected defendants' alternative argument that where a homeowner has no contractual relationship with a subcontractor there can be no implied warranty of habitability and, thus, *Minton* was wrongly decided. *Id.* ¶¶ 96-98.

¶ 10 We granted defendants' petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Mar. 15, 2016).

¶ 11 Analysis

¶ 12 This appeal is brought pursuant to Illinois Supreme Court Rule 308 (eff. Feb. 26, 2010). Rule 308 permits the discretionary appeal of an otherwise unappealable interlocutory order of the circuit court where the court has certified that the order involves a question of law to which there is a substantial dispute and that resolution of the question will materially advance the litigation. *Id.* Our review is *de novo. Moore v. Chicago Park District*, 2012 IL 112788, ¶ 9.

¶ 13 In this case, the questions certified by the circuit court ask whether a plaintiff homeowner's claims against a subcontractor for breach of an implied warranty of habitability are barred where either the plaintiff has potential recourse from insurance policies or where actual proceeds are received by the plaintiff from a warranty escrow account. As defendants point out, underlying these certified questions is the general assumption that, at least in some instances, it is appropriate to recognize a claim for breach of an implied warranty of habitability against the subcontractors of a newly constructed home, even though the subcontractors have no contractual relationship with the homeowner. Defendants challenge this assumption, arguing that, where there is no contractual privity between a subcontractor and a homeowner, there is no implied warranty of habitability. Plaintiff in its brief does not dispute that we may

---

[1]The appellate court concluded that the material suppliers were not subject to an implied warranty of habitability for reasons unrelated to *Minton*. The material suppliers are not part of this appeal.

consider this threshold argument, and we agree. There is no point in determining whether recovery from a subcontractor depends on the availability of recourse from an insolvent developer-vendor if the implied warranty of habitability itself does not exist. See, *e.g.*, *Fireman's Fund Insurance Co. v. SEC Donohue, Inc.*, 176 Ill. 2d 160, 164-66 (1997) (considering underlying premise of Rule 308 questions). Accordingly, we modify the questions certified by the circuit court to add a threshold inquiry: May the purchaser of a newly constructed home assert a claim for breach of an implied warranty of habitability against a subcontractor who took part in the construction of the home, where the subcontractor had no contractual relationship with the purchaser? See, *e.g.*, *Hampton v. Metropolitan Water Reclamation District of Greater Chicago*, 2016 IL 119861, ¶ 10 (modifying Rule 308 questions); *De Bouse v. Bayer AG*, 235 Ill. 2d 544, 556-57 (2009); *Boyd v. Travelers Insurance Co.*, 166 Ill. 2d 188, 192-93 (1995) (same). We turn now to this question.

¶ 14        The implied warranty of habitability for newly constructed homes was first recognized by this court in *Petersen v. Hubschman Construction Co.*, 76 Ill. 2d 31 (1979). In *Petersen*, this court held that an implied warranty of habitability protects the first purchaser of a new house against latent defects that would render the house not reasonably fit for its intended use. The court stated that it was necessary to recognize such a warranty due to the significant changes in the construction methods and marketing of new houses that had arisen in the modern era. The court explained that many "new houses are, in a sense, now mass produced," that the buyer often purchases the house "from a model home or from predrawn plans," and that the buyer of a newly constructed house "has little or no opportunity to inspect" the construction. *Id.* at 40. The court stated that the purchaser "must rely upon the integrity and the skill of the builder-vendor" and concluded that the "vendee has a right to expect to receive that for which he has bargained and that which the builder-vendor has agreed to construct and convey to him, that is, a house that is reasonably fit for use as a residence." *Id.* For these reasons, the court determined that recognition of an implied warranty of habitability was appropriate.

¶ 15        Importantly, *Petersen* stressed that the implied warranty of habitability is based in the contract of sale. It arises, the court explained, "by virtue of the execution of the agreement between the vendor and the vendee." *Id.* at 41. The warranty exists "as an independent undertaking collateral to the covenant to convey" that relaxes the rule of *caveat emptor* and the doctrine of merger, and it should be understood as "an implied covenant by the builder-vendor that the house which he contracts to build and to convey to the vendee is reasonably suited for its intended use." *Id.*

¶ 16        In addition, the *Petersen* court recognized that, while the implied warranty of habitability is a "creature of public policy," it could nevertheless be waived by the purchaser. *Id.* at 43. While finding that any waiver provision would have to be conspicuous and fully disclose its consequences, the *Petersen* court determined that such a waiver would not be against public policy. *Id.*

¶ 17        Subsequent to *Petersen*, this court has never held that a homeowner may pursue a claim for breach of an implied warranty of habitability against a subcontractor. Plaintiff maintains that we should recognize such a cause of action now. Plaintiff acknowledges the contractual origins of the implied warranty of habitability and further acknowledges that neither it nor the individual condominium owners at issue in this case had contracts with the defendant subcontractors. Nevertheless, plaintiff maintains that its cause of action should proceed.

¶ 18    Plaintiff analogizes to the law of personal injury and strict products liability. Plaintiff points out that product liability law has its origins in the concepts of implied warranties and contract law and that many of the early decisions limited the right to recover for personal injuries from defective products to those who were in contractual privity with the manufacturer. See, *e.g.*, *Winterbottom v. Wright* (1842) 152 Eng. Rep. 402; 10 M. & W. 109. Over time, however, product liability law evolved to the point that contractual privity was no longer required, and the action to recover against the manufacturer came to be recognized as a tort. See, *e.g.*, *Suvada v. White Motor Co.*, 32 Ill. 2d 612, 617 (1965) ("lack of privity is not a defense in a tort action against the manufacturer").

¶ 19    Plaintiff contends that we should follow the same course here. Plaintiff contends that "privity should not be a factor" in determining whether its claims for breach of an implied warranty of habitability may go forward against defendants because its claims are really tort or "tort-like" causes of action. Plaintiff explains that, because "an implied warranty of habitability claim is not governed by contract, there is no reason why the implied warranty should not be similarly applied against a subcontractor in the same way a tort claim is applied against a component supplier" in product liability law. In short, plaintiff maintains that an owner of a newly constructed home should be allowed to proceed directly against a subcontractor under a claim that is "analogous to a strict liability tort claim." We disagree.

¶ 20    Plaintiff's contention that the implied warranty of habitability should be considered an action in tort is refuted by the economic loss rule recognized by this court in *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69 (1982). In *Moorman*, this court held that, in an action against a product manufacturer, a plaintiff "cannot recover for solely economic loss under the tort theories of strict liability, negligence and innocent misrepresentation." *Id.* at 91. Economic loss is, in turn, defined as " 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits— without any claim of personal injury or damage to other property ***' [citation]." *Id.* at 82. The *Moorman* court recognized three exceptions to the economic loss rule: (1) where the plaintiff sustained damage, *i.e.*, personal injury or property damage, resulting from a sudden or dangerous occurrence (*id.* at 86); (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, *i.e.*, fraud (*id.* at 91); and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions (*id.* at 89).

¶ 21    The *Moorman* doctrine is intended to preserve the distinction between tort and contract. As this court has explained:

"In essence, the economic loss, or commercial loss, doctrine denies a remedy in tort to a party whose complaint is rooted in disappointed contractual or commercial expectations. (See *Seely v. White Motor Co.* (1965), 63 Cal. 2d 9, 18 ***; see also *Miller v. United States Steel Corp.* (7th Cir. 1990), 902 F.2d 573, 574 (suggesting that the term 'commercial loss' rather than 'economic loss' more accurately reflects the conceptual foundations of the principle).) The doctrine reflects the principle that there are varying degrees of quality, all commercially acceptable, that parties to a commercial transaction are free to bargain over if they choose. For example, an architect's selection of the construction materials to be used in a particular structure

will depend in large part on the amount of money the owner is willing to spend on the project. Disputes later arising from the character of the materials used should be determined under principles of contract law, and should be controlled by the requirements imposed by the parties' own undertaking. In that instance, the contract itself serves best to define the parties' respective rights and obligations." *Collins v. Reynard*, 154 Ill. 2d 48, 54-55 (1992) (Miller, J., specially concurring, joined by Bilandic, Freeman, and Cunningham, JJ.).

In general then, an action for economic loss requires the plaintiff to be in contractual privity with the defendant. *Bernot v. Primus Corp.*, 278 Ill. App. 3d 751, 754 (1996); *East River Steamship Corp. v. Transamerica Delaval Inc.,* 476 U.S. 858, 870 (1986) (the failure of a purchaser to receive the benefit of his bargain is "traditionally the core concern of contract law"). In addition, the economic loss rule has not been limited to strict liability actions against product manufacturers and has been frequently applied in construction cases. See, *e.g.*, *2314 Lincoln Park West Condominium Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 136 Ill. 2d 302 (1990); *Morrow v. L.A. Goldschmidt Associates, Inc.*, 112 Ill. 2d 87 (1986); *Foxcroft Townhome Owners Ass'n v. Hoffman Rosner Corp.*, 96 Ill. 2d 150 (1983); *Redarowicz v. Ohlendorf*, 92 Ill. 2d 171 (1982).

¶ 22    The implied warranty of habitability allows the homeowner to recover solely for latent defects that interfere with the home's intended use. *Park v. Sohn*, 89 Ill. 2d 453, 461 (1982) ("That warranty, implied in the contract of sale, was that the house, when conveyed, would be reasonably suited for its intended use."). This is the definition of pure economic loss under *Moorman*, *i.e.*, when the product disappoints the purchaser's commercial expectations and does not conform to its intended use. Accordingly, under *Moorman*, the implied warranty of habitability cannot be characterized as a tort.

¶ 23    Plaintiff stresses, however, that, unlike most contractual terms that are agreed to by the parties, the implied warranty of habitability exists as a matter of law and, thus, the warranty is in reality a duty in tort imposed by the courts. Plaintiff is correct that the warranty is implied by the courts as a matter of public policy. However, an implied term in a contract is no less contractual in nature simply because it is implied by the courts, and the fact that a contractual term is imposed by law does not automatically convert any cause of action for violating that term into a tort. See, *e.g.*, *Woodward v. Chirco Construction Co.*, 687 P.2d 1269, 1271 (Ariz. 1984) (court's statement that "the implied warranty of workmanlike performance and habitability 'is imposed by law' was not meant to transform the duty arising out of the contract into one based on tort principles alone"); *Aronsohn v. Mandara*, 484 A.2d 675, 679 (N.J. 1984) ("The implied covenants and terms of a contract are as effective components of the agreement as those expressed."). And this point is underscored by the fact that, in *Petersen*, this court held that the implied warranty of habitability may be waived by the purchaser. *Petersen*, 76 Ill. 2d at 43. A person may choose not to commence an action in tort, but he cannot waive a duty imposed by the courts. This court's holding in *Petersen* that the implied warranty of habitability is a contractual term that may be waived is a conclusive indication that a cause of action for breach of the warranty must be based in contract, not tort.

¶ 24    In light of the foregoing, it is clear that to hold the implied warranty of habitability is a duty imposed in tort, as plaintiff contends, we would necessarily have to recognize a new exception to the *Moorman* doctrine and also eliminate the option of waiver of the warranty. Not only

does this implicate principles of *stare decisis*, but it also raises significant practical problems, particularly for subcontractors. Subcontractors depend upon contract law and their contracts with the general contractor to protect and define their risks and economic expectations. The subcontractors' fees and costs are set in relation to their liability exposure, which is controlled in turn by their contracts. To allow what is, in effect, a tort claim to be brought directly against subcontractors by homeowners would undermine and, in some instances, render pointless these contractual obligations and restraints. Avoiding this outcome and preserving the distinction between tort and contract law is the principal point of the economic loss rule. See, *e.g.*, *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, ¶ 21, 221 P.3d 234; *Association of Apartment Owners of Newtown Meadows v. Venture 15, Inc.*, 167 P.3d 225, 285 (Haw. 2007); Ward Farnsworth, *The Economic Loss Rule*, 50 Val. U. L. Rev. 545 (2016).

¶ 25    As it did in the lower courts, plaintiff points to *Minton* in support of allowing its claims for breach of an implied warranty of habitability to go forward. As noted previously, *Minton* held that, where the purchaser of a newly constructed home "has no recourse to the builder-vendor and has sustained loss due to the faulty and latent defect in their new home caused by the subcontractor, the warranty of habitability applies to such subcontractor." *Minton*, 116 Ill. App. 3d at 855. We find *Minton* unpersuasive. Because there is no contractual privity between a homeowner and a subcontractor, *Minton* essentially recognized a tort action against subcontractors for economic loss where the builder-vendor is bankrupt. *Minton* said nothing about *Moorman* or why the economic loss rule would not apply, and it did not address what effect its holding would have on the contractual relationships between subcontractors and general contractors. Further, we can find no authority for the idea that a tort duty comes into and out of existence depending on whether another entity is bankrupt. For these reasons, *Minton* is overruled.

¶ 26    Plaintiff also relies on this court's decision in *Redarowicz v. Ohlendorf*, 92 Ill. 2d 171 (1982). In *Redarowicz*, this court held that the implied warranty of habitability could be extended to the second purchaser of a home and, in so holding, stated "[p]rivity of contract is not required." *Id.* at 183. From this, plaintiff argues that this court has already effectively held that a claim for breach of an implied warranty of habitability is a tort claim that exists independently of all privity concerns. Plaintiff reads *Redarowicz* too broadly. Reading *Redarowicz* as plaintiff suggests would run counter to the economic loss rule, a rule that *Redarowicz* itself recognized and applied. *Id.* at 176-78. Instead, as this court recently explained in *Fattah v. Bim*, 2016 IL 119365, *Redarowicz* stands for a narrower principle.

¶ 27    *Redarowicz* allowed a subsequent purchaser to enforce the implied warranty of habitability because the builder-vendor in that situation "is held to nothing more than those obligations that arose from its original contract with the first purchaser." *Id.* ¶ 26. Allowing subsequent purchasers to enforce the implied warranty does nothing more than recognize an implied assignment of a first buyer's warranty rights, with the second purchaser "merely stepping into the shoes of the first." *Id.* ¶ 34. *Redarowicz* did not create a tort or tort-like cause of action for economic loss and did not expand the class of defendants to include those who were not a party to the underlying sales contract.

¶ 28    Finally, plaintiff contends that denying its causes of action against defendants in this case would leave the owners of the condominium units without a judicial remedy since TR Sienna

is bankrupt. We reject this argument. The fact that a defendant may become bankrupt is a possibility faced by every civil litigant. Upon purchase of their condominium units, the homeowners in this case possessed a potential cause of action against TR Sienna for breach of the implied warranty of habitability (assuming they had not waived the warranty). The fact that TR Sienna subsequently became bankrupt does not mean that the homeowners in this case were deprived of a remedy by the courts.

¶ 29                                               Conclusion

¶ 30      The loss that can be recovered under the implied warranty of habitability is for disappointed commercial expectation, *i.e.*, pure economic loss. As such, the implied warranty of habitability must be a creature of contract, not tort. *933 Van Buren Condominium Ass'n v. West Van Buren, LLC*, 2016 IL App (1st) 143490, ¶ 58 (the "argument that the implied warranty of habitability is a tort claim has no merit"). Accordingly, we answer the threshold question in this case in the negative. The purchaser of a newly constructed home may not pursue a claim for breach of an implied warranty of habitability against a subcontractor where there is no contractual relationship. Because of our resolution of this issue, we need not answer the remaining questions certified by the circuit court. We reverse the judgments of the appellate and circuit courts and remand the cause to the circuit court with directions to dismiss counts III through VI and count IX of plaintiff's complaint. See, *e.g.*, *Bayer AG*, 235 Ill. 2d at 558 (reversing the circuit court's underlying order in a Rule 308 appeal); *Heidelberger v. Jewel Cos.*, 57 Ill. 2d 87, 92-94 (1974) (same).

¶ 31            Certified question answered.
¶ 32            Appellate court judgment reversed.
¶ 33            Circuit court judgment reversed.
¶ 34            Cause remanded.

¶ 35            JUSTICE KILBRIDE, dissenting:

¶ 36      I disagree with the majority's conclusion that the implied warranty of habitability cannot be applied to the subcontractors in this case. In my view, applying the implied warranty of habitability to the circumstances here follows directly from our case law establishing and later extending the warranty. I would hold that plaintiffs may pursue a claim for breach of the warranty directly against the subcontractors for their defective work.

¶ 37      This court's case law establishes that the implied warranty of habitability is imposed as a matter of public policy. *Redarowicz v. Ohlendorf*, 92 Ill. 2d 171, 183 (1982); *Petersen v. Hubschman Construction Co.*, 76 Ill. 2d 31, 43 (1979). This court first recognized the warranty in *Petersen*. In that case, this court stated the implied warranty of habitability is a "judicial innovation" used to give relief to purchasers of new homes who subsequently discover latent defects. *Petersen*, 76 Ill. 2d at 38. The warranty is implied as a separate covenant in the contract for sale because of the "unusual dependent relationship" between the builder-vendor and the vendee. *Petersen*, 76 Ill. 2d at 41. This court explained that construction methods had changed and vendees now have little or no opportunity to inspect new houses prior to making, in many instances, the largest single investment of their lives. Vendees are usually not knowledgeable about construction practices and must rely to a substantial degree upon the integrity and skill

of the builder-vendor. Based on those concerns, this court held an implied warranty of habitability is included in the sale of a new house by a builder-vendor. *Petersen*, 76 Ill. 2d at 39-40.

¶ 38       In *Redarowicz*, we extended the implied warranty of habitability to subsequent purchasers, again recognizing that the warranty is a "judicial innovation that has evolved to protect purchasers of new houses upon discovery of latent defects in their homes." *Redarowicz*, 92 Ill. 2d at 183. While the warranty has roots in the contract for sale, this court emphasized that it exists independently and that "[p]rivity of contract is not required." *Redarowicz*, 92 Ill. 2d at 183. Like the initial purchaser, a subsequent purchaser has little opportunity to inspect construction methods, is usually not knowledgeable about construction practices, and must rely to a substantial degree upon the expertise of the builder. *Redarowicz*, 92 Ill. 2d at 183. Based on those considerations, this court concluded that, "[i]f construction of a new house is defective, its repair costs should be borne by the responsible builder-vendor who created the latent defect." *Redarowicz*, 92 Ill. 2d at 183.

¶ 39       In *Redarowicz*, this court extended the implied warranty of habitability based on the "compelling public policies" recited in *Petersen*, despite the lack of privity of contract between the builder and the subsequent purchaser. *Redarowicz*, 92 Ill. 2d at 183. We later explained that a second purchaser may receive the benefit of the implied warranty of habitability arising out of a sales contract between the first purchaser and the builder-vendor because "he is merely stepping into the shoes of the first purchaser." *Fattah v. Bim*, 2016 IL 119365, ¶ 34.

¶ 40       This court has also held that the implied warranty of habitability extends to a subsequent purchaser seeking damages against a builder who constructed a significant addition to an existing residence. *VonHoldt v. Barba & Barba Construction, Inc.*, 175 Ill. 2d 426, 432 (1997). The decision in *VonHoldt* was based on the same public policy concerns recited in *Petersen* and *Redarowicz*. *VonHoldt*, 175 Ill. 2d at 431-32. This court has specifically stated:

> "the same original policy considerations have consistently guided the growth of this doctrine. The policy, as explained in *Petersen*, applies the implied warranty of habitability to the sale of homes to protect today's purchasers, who generally do not possess the ability to determine whether the houses they have purchased contain latent defects. [Citations.] The purchaser needs this protection because, in most cases, the purchaser is making the largest single investment of his or her life and is usually relying upon the honesty and competence of the builder, who, unlike the typical purchaser, is in the business of building homes." *Board of Directors of Bloomfield Club Recreation Ass'n v. The Hoffman Group, Inc.*, 186 Ill. 2d 419, 425 (1999).

¶ 41       Thus, it is beyond question that the implied warranty of habitability was first recognized and later extended by this court based on the public policy of protecting innocent purchasers. *Redarowicz*, 92 Ill. 2d at 185. The specific purpose of the warranty is to protect purchasers' legitimate expectations by holding builder-vendors accountable. *Redarowicz*, 92 Ill. 2d at 185. We have extended the warranty to accomplish that purpose despite the lack of privity of contract between the parties. *Redarowicz*, 92 Ill. 2d at 183.

¶ 42       In *Minton v. The Richards Group of Chicago*, 116 Ill. App. 3d 852, 854-55 (1983), our appellate court held the warranty is applicable to subcontractors based on this court's established rationale. The appellate court observed that, while the warranty is rooted in the contract for sale, it exists independently to protect purchasers' reasonable expectations and

- 10 -

privity of contract is not required to impose the warranty. *Minton*, 116 Ill. App. 3d at 854 (citing *Redarowicz*, 92 Ill. 2d 171). Our appellate court, therefore, held that the implied warranty of habitability applies to a subcontractor when the purchaser has sustained loss due to a latent defect caused by the subcontractor and the purchaser cannot recover from the builder-vendor. *Minton*, 116 Ill. App. 3d at 855.

¶ 43 In my view, the policy considerations underlying the implied warranty of habitability support applying the warranty to subcontractors. Similar to the builder-vendor, subcontractors are in the business of construction and building homes, and they are knowledgeable about construction methods. The purchaser of a new home relies not only on the competence and integrity of the builder-vendor but also on the competence of the subcontractors. A subcontractor's work on a new home is necessarily performed for the benefit of the purchaser. As with the builder-vendor, a purchaser should be able to expect the subcontractor's work to contribute to "a house that is reasonably fit for use as a residence." See *Petersen*, 76 Ill. 2d at 40. The purchaser has a reasonable expectation that subcontractors will perform their work competently, and subcontractors should likewise expect to be held responsible for the cost to repair latent defects they have caused.

¶ 44 The policy considerations that have consistently guided this court's decisions on whether to extend the implied warranty of habitability strongly favor applying the warranty to subcontractors. As we held in *Redarowicz*, "[i]f construction of a new house is defective, its repair costs should be borne by the responsible builder-vendor who created the latent defect." *Redarowicz*, 92 Ill. 2d at 183. That statement may be applied equally to a subcontractor who created the latent defect. In those circumstances, the costs of repair should be borne by the responsible subcontractor, not by the innocent purchaser. See *Redarowicz*, 92 Ill. 2d at 183.

¶ 45 In sum, the policy considerations relied upon by this court in first recognizing and later extending the implied warranty of habitability apply with equal force here. A new home purchaser is necessarily dependent on those constructing the home, including both the builder-vendor and the subcontractors hired by the builder-vendor. *Petersen*, 76 Ill. 2d at 39-41. This court has extended the implied warranty based on the policy considerations underlying the warranty without regard to privity of contract. Based on those policy considerations, the implied warranty of habitability should also be extended to apply directly to subcontractors. Plaintiffs should be able to pursue a claim for breach of the warranty directly against the subcontractors for their own defective work, regardless of whether the builder-vendor is insolvent or whether any other recourse is available. I would affirm the appellate court's decision answering the certified questions in the negative. Accordingly, I respectfully dissent.